**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               *Plaintiff*,

v.

THE WALT DISNEY COMPANY, and
TWENTY-FIRST CENTURY FOX, INC.,

               *Defendants*.

Civil Action No.:

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the acquisition by The Walt Disney Company ("Disney") of certain assets and businesses of Twenty-First Century Fox, Inc. ("Fox") and to obtain other equitable relief.

## I.    NATURE OF THE ACTION

1.    Cable sports programming is one of the most popular forms of entertainment in the United States.  Disney's proposed acquisition of Fox's assets would combine two of the country's most valuable cable sports properties—Disney's ESPN franchise of networks and Fox's portfolio of Regional Sports Networks ("RSNs")—and thereby likely substantially lessen competition in the multiple Designated Market Areas ("DMAs") throughout the United States in which these two firms compete.

2.    Pursuant to an Agreement and Plan of Merger dated December 13, 2017, as amended on June 20, 2018, Disney agreed to acquire certain assets and businesses, including

Fox's ownership of or interests in its RSNs, FX cable networks, National Geographic cable networks, television studio, Hulu, film studio, and international television businesses, (the "Sale Assets") from Fox for approximately $71.3 billion (the "Transaction").  Fox operates and proposes to sell to Disney its interests in the following RSNs:  (i) Fox Sports Arizona, (ii) Fox Sports Carolinas, (iii) Fox Sports Detroit, (iv) Fox Sports Florida, (v) Fox Sports Indiana, (vi) Fox Sports Kansas City, (vii) Fox Sports Midwest, (viii) Fox Sports New Orleans, (ix) Fox Sports North, (x) Fox Sports Ohio, (xi) SportsTime Ohio, (xii) Fox Sports Oklahoma, (xiii) Fox Sports San Diego, (xiv) Fox Sports South, (xv) Fox Sports Southeast, (xvi) Fox Sports Southwest, (xvii) Fox Sports Sun, (xviii) Fox Sports Tennessee, (xix) Fox Sports West, (xx) Prime Ticket, (xxi) Fox Sports Wisconsin, and (xxii) the YES Network.



3.      An RSN is a cable network that telecasts live games of one or more local professional sports team—i.e., a "home" team or teams within that particular region.  An RSN's

contract with a local sports team typically provides the RSN with the exclusive rights, within a team's local region, to telecast live nearly all that team's games.  Collectively, the Fox RSNs are the largest group of commonly controlled RSNs.  In the aggregate, the Fox RSNs have approximately 61 million subscribers across the country and have rights to telecast live games of 44 of 91 (48%) U.S. professional sports teams in three of the four major sports leagues: Major League Baseball ("MLB"), the National Basketball Association ("NBA") and the National Hockey League ("NHL").  More specifically, the Fox RSNs have the local rights to 15 of 30 (50%) MLB teams, 17 of 30 (57%) NBA teams, and 12 of 31 (39%) NHL teams.

       4.     Cable sports television networks—including RSNs—compete to be carried in the programming packages that multichannel video programming distributors ("MVPDs"), such as Comcast, Charter, DISH, and FiOS, offer to their subscribers.  For RSNs, the carriage license typically is limited to the DMAs comprising the "home" territory of the team or teams carried on the RSN; whereas, licenses for national television networks typically comprise all DMAs in a MVPD's footprint.  Disney's and Fox's cable sports television programming compete head-to-head to be carried on MVPDs in all the DMAs where Fox's RSNs are located:  Phoenix, Arizona; Detroit, Michigan; Milwaukee, Wisconsin; Cleveland, Ohio; Cincinnati, Ohio; Columbus, Ohio; Miami, Florida; Oklahoma City, Oklahoma; Tampa Bay, Florida; Dallas, Texas; St. Louis, Missouri; Atlanta, Georgia; Indianapolis, Indiana; Orlando, Florida; San Antonio, Texas; Minneapolis, Minnesota; Nashville, Tennessee; Memphis, Tennessee; San Diego, California; Raleigh-Durham, North Carolina; New Orleans, Louisiana; Kansas City, Kansas; Charlotte, North Carolina; Los Angeles, California; and New York, New York (collectively, the "DMA Markets").

       5.     If consummated, the proposed acquisition would eliminate the substantial head-to-head competition that currently exists between Disney and Fox and would likely result in

higher prices for cable sports programming in each of the DMA Markets.  Consequently, Defendants' proposed Transaction likely would substantially lessen competition in those markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.   JURISDICTION, VENUE, AND COMMERCE

6.    The United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Disney and Fox from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.    The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.    Disney and Fox are engaged in interstate commerce and in activities substantially affecting interstate commerce.  They each license programming to MVPDs located across the country in exchange for license, or "affiliate," fees.  They each own and operate television networks that are distributed to viewers throughout the United States.  Their television programming licenses have had a substantial effect on interstate commerce.

9.    Defendants have consented to venue and personal jurisdiction in this District. Venue is also proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

## III.   THE DEFENDANTS

10.    Disney is a Delaware corporation headquartered in Burbank, California.  It reported revenue of $55 billion for fiscal year 2017.  Disney owns various television programming assets, including 80% of ESPN—a sports entertainment company that operates several domestic sports television networks.  Disney's other television programming assets include:  (i) the ABC television network; (ii) eight owned-and-operated ABC broadcast stations;

(iii) Disney-branded television networks; and (iv) Freeform, a television network geared toward teenagers and young adults.

11.     Fox is a Delaware corporation headquartered in New York, New York.  It reported revenue of $28.5 billion for fiscal year 2017.  The Fox Sale Assets, which include several television programing assets and all of the Fox RSNs, generated $19 billion in revenue for fiscal year 2017.

## IV.   RELEVANT MARKETS

12.     The licensing of cable sports programming to MVPDs constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.  This includes licensing to both MVPDs and virtual MVPDs.  Cable sports programming includes cable networks that devote a substantial portion of programming time to airing live sports events, such as MLB games.

13.     The DMA Markets constitute geographic markets under Section 7 of the Clayton Act.  A DMA is a geographical unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes MVPDs, among others, with data to aid in evaluating audience size and composition in a particular area.  DMAs are widely accepted by MVPDs as the standard geographic area to use in evaluating television audience size and demographic composition.  The Federal Communications Commission also uses DMAs as geographic units with respect to its MVPD regulations.

14.     Disney and Fox license cable sports programming to MVPDs in each of the DMA Markets in which MVPDs provide programming to subscribers as part of bundled channel packages.  Disney's and Fox's cable sports programming in each of the DMA Markets generates a significant amount of revenue through licensing fees to MVPDs in those markets.

15.     Sports programming is important to MVPDs because sports viewers comprise an important customer group for MVPDs, and MVPDs could not attract many of these sports viewers without including sports television programming in the MVPDs' packages of available networks.

16.     For MVPDs, sports programming on broadcast television is unlikely a sufficient substitute for cable sports programming.  MVPDs do not typically consider broadcast networks as providing the same type of content as cable networks like ESPN and the RSNs.  Broadcast networks and their affiliates aim to have broad appeal by offering a variety of highly-rated programming content including primetime entertainment shows, syndicated shows, and local and national news and weather in addition to sports, with marquee sports events making up a small percentage of a broadcast network's airtime.  For that reason, MVPDs do not typically consider broadcast network programming as a replacement for cable sports programming.

17.     Accordingly, a hypothetical monopolist of all cable sports programming in a DMA Market likely would profitably increase licensing fees to MVPDs in that DMA Market by at least a small but significant amount.

## V.     LIKELY ANTICOMPETITIVE EFFECTS

18.     The cable sports programming market in nearly all of the DMA Markets is already highly concentrated.  As a result of the Transaction, Disney's networks would account for at least 60 percent of cable sports programming revenue in 19 of the DMA Markets and over 45 percent in the remaining six DMA Markets.  Consequently, bringing Disney's ESPN networks and Fox's RSNs under common ownership would significantly concentrate the cable sports programming market in each of the DMA Markets.

19.     Market concentration is often a useful indicator of the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase

concentration in a market, the more likely it is that the transaction would result in a meaningful

reduction in competition that harms consumers.

20.     The Herfindahl-Hirschman Index ("HHI") is a standard measure of market

concentration.  Under the *Horizontal Merger Guidelines* issued by the Department of Justice and

the Federal Trade Commission, mergers resulting in highly concentrated markets (with an HHI

in excess of 2,500) that involve an increase in the HHI of more than 200 points are presumed to

be likely to enhance market power.

21.     Using 2017 gross cable sports programming revenue, in each of the DMA

Markets, the combination of Disney and the Fox Sale Assets would result in HHIs in excess of

2,500 and involve an increase in the HHI of more than 200.  Therefore, in each DMA Market,

the HHI levels are above the thresholds at which a merger is presumed likely to enhance market

power.

22.     For example, in the Detroit DMA Market, where Fox operates Fox Sports Detroit,

the Transaction would result in a post-merger HHI of over 4,000 with an increase of over 1,400.

Therefore, in this market, the Transaction results in a presumptively anticompetitive level of

concentration.  Similarly, the Transaction would result in presumptively anticompetitive levels of

concentration in each of the other DMA Markets.

23.     In addition to substantially increasing concentration levels in each of the DMA

Markets, the proposed Transaction would combine cable sports networks that are at least partial

substitutes.  Accordingly, the proposed Transaction would likely diminish competition in the

negotiation of licenses for cable sports programming with MVPDs that have subscribers in the

DMA Markets.  Post-acquisition, Disney would gain the ability to threaten MVPDs in each of

the DMA Markets with the simultaneous blackout of two of the most significant cable networks

carrying sports programming:  ESPN and a local RSN.  ESPN and the local Fox RSN generate

the highest and second-highest affiliate fees per subscriber in most of the 25 DMAs, and they are among the networks that generate the highest affiliate fees per subscriber in every one of the 25 DMAs.

24.     The threat of double blackouts in the DMA Markets—and the resulting disproportionate loss of an MVPD's subscribers and profits—likely would significantly strengthen Disney's bargaining position with MVPDs.  Before the merger, an MVPD's failure to reach an agreement with Disney could result in a blackout of Disney's networks in the MVPD's footprint and threaten it with some subscriber loss.  But the MVPD would still be able to offer the sports programming on Fox's RSNs during a Disney blackout, thereby minimizing subscription cancellations.  After the merger, an MVPD negotiating with Disney would face the prospect of a dual blackout of ESPN and the local RSN in one or more DMA Markets, likely resulting in disproportionately more subscriber loss.  Because the leverage that a television programmer has in negotiations with the MVPD is derived at least in part from its leverage within each DMA Market in the MVPD's footprint, the threat of a dual blackout would likely cause an MVPD to accede to a demand by Disney for higher license fees.  For these reasons, the loss of competition between Disney and the Fox Sale Assets in each DMA Market would likely lead to an increase in total licensing fees in each DMA Market and, because increased licensing fees typically are passed on to consumers, would result in higher subscription fees for customers of MVPDs.

## VI.     ABSENCE OF COUNTERVAILING FACTORS

25.     Entry would not be timely, likely or sufficient to prevent the Transaction's likely anticompetitive effects.  Professional sport teams auction the exclusive rights to telecast their games under long-term contracts.  Because these contracts typically last many years, there are infrequent opportunities for entrants to bid for these highly valuable licensing rights.

26.     Defendants cannot demonstrate acquisition-specific and cognizable efficiencies that would be sufficient to offset the proposed acquisition's likely anticompetitive effects.

## VII.   VIOLATIONS ALLEGED

27.     Disney's proposed acquisition of the Fox Sale Assets likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The proposed acquisition likely would:

  a.    substantially lessen competition in the licensing of cable sports programming in each of the DMA Markets;

  b.    eliminate actual and potential competition among Disney and Fox in the licensing of cable sports programming in each of the DMA Markets; and

  c.    cause prices for cable sports programming in each of the DMA Markets to increase.

## VIII.  REQUEST FOR RELIEF

28.     The United States requests that the Court:

  a.    adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

  b.    permanently enjoin and restrain Defendants from carrying out the Transaction, or entering into any other agreement, understanding, or plan by which Disney would acquire the Fox Sale Assets;

  c.    award the United States the costs of this action; and

  d.    award such other relief to the United States as the Court may deem just and proper.

Dated: June 27, 2018

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA

_____
MAKAN DELRAHIM
Assistant Attorney General for Antitrust

_____
ANDREW C. FINCH
Principal Deputy Assistant Attorney General

_____
PATRICIA A. BRINK
Director of Civil Enforcement

_____
OWEN M. KENDLER
Chief, Media, Entertainment & Professional
Services Section

_____
YVETTE TARLOV
Assistant Chief, Media, Entertainment &
Professional Services Section

_____
CRAIG D. MINERVA
LEE F. BERGER
JEREMY EVANS
RACHEL FLIPSE
BRIAN HANNA
MARK MERVA
KATE RIGGS
LAUREN RIKER
MONSURA SIRAJEE
ADAM C. SPEEGLE
LOWELL STERN

United States Department of Justice
Antitrust Division
Media, Entertainment & Professional
Services Section
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 353-2384
Facsimile: (202) 514-730