

**U.S. Department of Justice**

Antitrust Division

---

*Liberty Square Building*

*450 5ᵗʰ Street, N.W.*
*Washington, DC 20001*

**By ECF**                                              August 24, 2018

The Honorable Colleen McMahon
Chief Judge
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    *United States v. The Walt Disney Company, et al.*, 18 Civ. 5800 (CM);
Joint Motion to Request the Adjournment of the Initial Pretrial Conference and Stay
Further Proceedings

Dear Chief Judge McMahon:

    The Parties respectfully move to adjourn the Initial Pretrial Conference scheduled
for September 7, 2018 at 11:30 am and to stay further proceedings pending the resolution
of the procedure required by the Antitrust Procedures and Penalties Act, 15 U.S.C. §
16(b)–(h) (the "APPA"). The Parties filed a joint letter to Your Honor on August 7, 2018,
requesting the Court sign the Hold Separate Stipulation and Order jointly proposed by the
Parties, cancel the Initial Pretrial Conference, and conclude that a civil case management
plan is not necessary in this case (Docket Entry 20). The Parties' previous request was
neither granted nor denied.

    Statutory procedures in the APPA govern the entry of the proposed Final
Judgement, as described more fully in the Explanation of Consent Decree Procedures
filed on June 28, 2018 (Docket Entry 3). The APPA requires a public notice and sixty-
day comment period before the United States may ask the Court to enter the proposed
Final Judgment. On August 15, 2018, the United States published the proposed Final
Judgment and Competitive Impact Statement in the *Federal Register*, 83 F.R. 40553
(Exhibit A). From August 13 to 19, 2018, the required newspaper notices appeared in the
New York Times (Exhibit B) and the Washington Post (Exhibit C). Upon completion of
the two notice procedures, the sixty-day comment period required by the APPA has
commenced. The requested adjournment will have no effect on the Parties' ability to
meet their obligations under the APPA or any other dates in this matter.

    In light of the fact that the case was filed along with a proposed settlement and the
statutory requirement to follow the APPA's procedures, the Parties respectfully submit
that a stay of further proceedings pending the completion of the APPA process would
contribute to the efficient management of the case.

The Parties are available to answer any questions the Court may have regarding this motion.

Respectfully submitted,                          Respectfully submitted,

_Thomas O. Barnett_ mg 8/23/18          _Lowell R. Stern_

Thomas O. Barnett                                Lowell R. Stern
Covington & Burling LLP                          United States Department of Justice
One CityCenter                                   Antitrust Division
850 Tenth Street, NW                             450 Fifth Street, NW, Suite 8700
Washington, DC 20001-4925                        Washington, DC 20530
Tel: 202-662-5407                                Tel: 202-514-3676
tbarnett@cov.com                                 lowell.stern@usdoj.gov

Counsel for The Walt Disney Company              Counsel for the United States

_George S. Cary_

George S. Cary
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-974-1920
gcary@cgsh.com

Counsel for Twenty-First Century Fox,
Inc.

*United States v. The Walt Disney Company et al.*, 18 Civ. 5800 (CM)

# Exhibit A


**Federal Register** / Vol. 83, No. 158 / Wednesday, August 15, 2018 / Notices **40553**

## Commencement of Final Phase Investigations

Pursuant to section 207.18 of the Commission's rules, the Commission also gives notice of the commencement of the final phase of its investigations. The Commission will issue a final phase notice of scheduling, which will be published in the **Federal Register** as provided in section 207.21 of the Commission's rules, upon notice from the U.S. Department of Commerce ("Commerce") of affirmative preliminary determinations in the investigations under sections 703(b) or 733(b) of the Act, or, if the preliminary determinations are negative, upon notice of affirmative final determinations in those investigations under sections 705(a) or 735(a) of the Act. Parties that filed entries of appearance in the preliminary phase of the investigations need not enter a separate appearance for the final phase of the investigations. Industrial users, and, if the merchandise under investigation is sold at the retail level, representative consumer organizations have the right to appear as parties in Commission antidumping and countervailing duty investigations. The Secretary will prepare a public service list containing the names and addresses of all persons, or their representatives, who are parties to the investigations.

## Background

On June 20, 2018, the Coalition for Fair Rack Imports[4] filed petitions with the Commission and Commerce, alleging that an industry in the United States is materially injured or threatened with material injury by reason of subsidized imports of steel racks from China and LTFV imports of steel racks from China. Accordingly, effective June 20, 2018, the Commission, pursuant to sections 703(a) and 733(a) of the Act (19 U.S.C. 1671b(a) and 1673b(a)), instituted countervailing duty investigation No. 701–TA–608 and antidumping duty investigation No. 731–TA–1420 (Preliminary).

Notice of the institution of the Commission's investigations and of a public conference to be held in connection therewith was given by posting copies of the notice in the Office

of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** of June 26, 2018 (83 FR 29822). The conference was held in Washington, DC, on July 11, 2018, and all persons who requested the opportunity were permitted to appear in person or by counsel.

The Commission made these determinations pursuant to sections 703(a) and 733(a) of the Act (19 U.S.C. 1671b(a) and 1673b(a)). It completed and filed its determinations in these investigations on August 6, 2018. The views of the Commission are contained in USITC Publication 4811 (August 2018), entitled *Steel Racks from China: Investigation Nos. 701–TA–608 and 731–TA–1420 (Preliminary).*

By order of the Commission.

Issued: August 9, 2018.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2018–17476 Filed 8–14–18; 8:45 am]

**BILLING CODE 7020–02–P**

## DEPARTMENT OF JUSTICE

### Antitrust Division

### United States v. The Walt Disney Company, et al.; Proposed Final Judgment and Competitive Impact Statement

Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h), that a proposed Final Judgment, Stipulation, and Competitive Impact Statement have been filed with the United States District Court for the Southern District of New York in *United States of America* v. *The Walt Disney Company, et al.,* Civil Action No. 1:18–cv–05800. On June 27, 2018, the United States filed a Complaint alleging that The Walt Disney Company's proposed acquisition of certain assets from Twenty-First Century Fox, Inc. would violate Section 7 of the Clayton Act, 15 U.S.C. 18. The proposed Final Judgment, filed at the same time as the Complaint, requires The Walt Disney Company to divest Fox's interests in the following regional sports networks: (i) Fox Sports Arizona; (ii) Fox Sports Carolinas; (iii) Fox Sports Detroit; (iv) Fox Sports Florida; (v) Fox Sports Indiana; (vi) Fox Sports Kansas City; (vii) Fox Sports Midwest; (viii) Fox Sports New Orleans; (ix) Fox Sports North; (x) Fox Sports Ohio; (xi) SportsTime Ohio; (xii) Fox Sports Oklahoma; (xiii) Fox Sports San Diego; (xiv) Fox Sports South; (xv) Fox Sports Southeast; (xvi) Fox Sports Southwest;

(xvii) Fox Sports Sun; (xviii) Fox Sports Tennessee; (xix) Fox Sports West; (xx) Prime Ticket; (xxi) Fox Sports Wisconsin; and (xxii) the YES Network.

Copies of the Complaint, proposed Final Judgment, and Competitive Impact Statement are available for inspection on the Antitrust Division's website at *http://www.justice.gov/atr* and at the Office of the Clerk of the United States District Court for the Southern District of New York. Copies of these materials may be obtained from the Antitrust Division upon request and payment of the copying fee set by Department of Justice regulations.

Public comment is invited within 60 days of the date of this notice. Such comments, including the name of the submitter, and responses thereto, will be posted on the Antitrust Division's website, filed with the Court, and, under certain circumstances, published in the **Federal Register**. Comments should be directed to Owen M. Kendler, Chief, Media, Entertainment, and Professional Services Section, Antitrust Division, Department of Justice, Washington, DC 20530, (telephone: 202–305–8376).

**Patricia A. Brink,**

*Director of Civil Enforcement.*

### United States District Court for the Southern District of New York

*United States of America*, Plaintiff, v. *The Walt Disney Company*, and *Twenty-First Century Fox, Inc.*, Defendants. Civil Action No.: 1:18-cv-05800 (CM)(KNF)

### COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the acquisition by The Walt Disney Company ("Disney") of certain assets and businesses of Twenty-First Century Fox, Inc. ("Fox") and to obtain other equitable relief.

### I. NATURE OF THE ACTION

1. Cable sports programming is one of the most popular forms of entertainment in the United States. Disney's proposed acquisition of Fox's assets would combine two of the country's most valuable cable sports properties— Disney's ESPN franchise of networks and Fox's portfolio of Regional Sports Networks ("RSNs")—and thereby likely substantially lessen competition in the multiple Designated Market Areas ("DMAs") throughout the United States in which these two firms compete.

2. Pursuant to an Agreement and Plan of Merger dated December 13, 2017, as amended on June 20, 2018, Disney agreed to acquire certain assets and businesses, including Fox's ownership

---

[4] Members of the Coalition are Bulldog Rack Company, Weirton, West Virginia; Hannibal Industries, Inc., Los Angeles, California; Husky Rack and Wire, Denver, North Carolina; Ridg-U-Rak, Inc., North East, Pennsylvania; SpaceRAK, A Division of Heartland Steel Products, Inc., Marysville, Michigan; Speedrack Products Group, Ltd., Sparta, Michigan; Steel King Industries, Inc., Stevens Point, Wisconsin; Tri-Boro Shelving & Partition Corp., Farmville, Virginia; and UNARCO Material Handling, Inc., Springfield, Tennessee.

of or interests in its RSNs, FX cable networks, National Geographic cable networks, television studio, Hulu, film studio, and international television businesses, (the "Sale Assets") from Fox for approximately $71.3 billion (the "Transaction"). Fox operates and proposes to sell to Disney its interests in the following RSNs: (i) Fox Sports Arizona, (ii) Fox Sports Carolinas, (iii) Fox Sports Detroit, (iv) Fox Sports Florida, (v) Fox Sports Indiana, (vi) Fox Sports Kansas City, (vii) Fox Sports Midwest, (viii) Fox Sports New Orleans, (ix) Fox Sports North, (x) Fox Sports Ohio, (xi) SportsTime Ohio, (xii) Fox Sports Oklahoma, (xiii) Fox Sports San Diego, (xiv) Fox Sports South, (xv) Fox Sports Southeast, (xvi) Fox Sports Southwest, (xvii) Fox Sports Sun, (xviii) Fox Sports Tennessee, (xix) Fox Sports West, (xx) Prime Ticket, (xxi) Fox Sports Wisconsin, and (xxii) the YES Network.



3. An RSN is a cable network that telecasts live games of one or more local professional sports team—i.e., a "home" team or teams within that particular region. An RSN's contract with a local sports team typically provides the RSN with the exclusive rights, within a team's local region, to telecast live nearly all that team's games. Collectively, the Fox RSNs are the largest group of commonly controlled RSNs. In the aggregate, the Fox RSNs have approximately 61 million subscribers across the country and have rights to telecast live games of 44 of 91 (48%) U.S. professional sports teams in three of the four major sports leagues: Major League Baseball ("MLB"), the National Basketball Association ("NBA") and the National Hockey League ("NHL"). More specifically, the Fox RSNs have the local rights to 15 of 30 (50%) MLB teams, 17 of 30 (57%) NBA teams, and 12 of 31 (39%) NHL teams.

4. Cable sports television networks— including RSNs—compete to be carried in the programming packages that multichannel video programming distributors ("MVPDs"), such as Comcast, Charter, DISH, and FiOS, offer to their subscribers. For RSNs, the carriage license typically is limited to the DMAs comprising the "home" territory of the team or teams carried on the RSN; whereas, licenses for national television networks typically comprise all DMAs in a MVPD's footprint. Disney's and Fox's cable sports television programming compete head-to-head to be carried on MVPDs in all the DMAs where Fox's RSNs are located: Phoenix, Arizona; Detroit, Michigan; Milwaukee, Wisconsin; Cleveland, Ohio; Cincinnati, Ohio; Columbus, Ohio; Miami, Florida; Oklahoma City, Oklahoma; Tampa Bay, Florida; Dallas, Texas; St. Louis, Missouri; Atlanta, Georgia; Indianapolis, Indiana; Orlando, Florida; San Antonio, Texas; Minneapolis, Minnesota; Nashville, Tennessee; Memphis, Tennessee; San Diego, California; Raleigh-Durham, North Carolina; New Orleans, Louisiana; Kansas City, Kansas; Charlotte, North Carolina; Los Angeles, California; and New York, New York (collectively, the "DMA Markets").

5. If consummated, the proposed acquisition would eliminate the substantial head-to-head competition that currently exists between Disney and Fox and would result in higher prices for cable sports programming in each of the DMA Markets. Consequently, Defendants' proposed Transaction likely would substantially lessen competition in those markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. JURISDICTION, VENUE, AND COMMERCE

6. The United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Disney and Fox from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7. The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8. Disney and Fox are engaged in interstate commerce and in activities substantially affecting interstate commerce. They each license programming to MVPDs located across the country in exchange for license, or "affiliate," fees. They each own and operate television networks that are distributed to viewers throughout the United States. Their television programming licenses have had a substantial effect on interstate commerce.

9. Defendants have consented to venue and personal jurisdiction in this

District. Venue is also proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

## III. THE DEFENDANTS

10. Disney is a Delaware corporation headquartered in Burbank, California. It reported revenue of $55 billion for fiscal year 2017. Disney owns various television programming assets, including 80% of ESPN—a sports entertainment company that operates several domestic sports television networks. Disney's other television programming assets include: (i) the ABC television network; (ii) eight owned-and-operated ABC broadcast stations; (iii) Disney-branded television networks; and (iv) Freeform, a television network geared toward teenagers and young adults.

11. Fox is a Delaware corporation headquartered in New York, New York. It reported revenue of $28.5 billion for fiscal year 2017. The Fox Sale Assets, which include several television programing assets and all of the Fox RSNs, generated $19 billion in revenue for fiscal year 2017.

## IV. RELEVANT MARKETS

12. The licensing of cable sports programming to MVPDs constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act. This includes licensing to both MVPDs and virtual MVPDs. Cable sports programming includes cable networks that devote a substantial portion of programming time to airing live sports events, such as MLB games.

13. The DMA Markets constitute geographic markets under Section 7 of the Clayton Act. A DMA is a geographical unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes MVPDs, among others, with data to aid in evaluating audience size and composition in a particular area. DMAs are widely accepted by MVPDs as the standard geographic area to use in evaluating television audience size and demographic composition. The Federal Communications Commission also uses DMAs as geographic units with respect to its MVPD regulations.

14. Disney and Fox license cable sports programming to MVPDs in each of the DMA Markets in which MVPDs provide programming to subscribers as part of bundled channel packages. Disney's and Fox's cable sports programming in each of the DMA Markets generates a significant amount of revenue through licensing fees to MVPDs in those markets.

15. Sports programming is important to MVPDs because sports viewers comprise an important customer group for MVPDs, and MVPDs could not attract many of these sports viewers without including sports television programming in the MVPDs' packages of available networks.

16. For MVPDs, sports programming on broadcast television is unlikely a sufficient substitute for cable sports programming. MVPDs do not typically consider broadcast networks as providing the same type of content as cable networks like ESPN and the RSNs. Broadcast networks and their affiliates aim to have broad appeal by offering a variety of highly-rated programming content including primetime entertainment shows, syndicated shows, and local and national news and weather in addition to sports, with marquee sports events making up a small percentage of a broadcast network's airtime. For that reason, MVPDs do not typically consider broadcast network programming as a replacement for cable sports programming.

17. Accordingly, a hypothetical monopolist of all cable sports programming in a DMA Market likely would profitably increase licensing fees to MVPDs in that DMA Market by at least a small but significant amount.

## V. LIKELY ANTICOMPETITIVE EFFECTS

18. The cable sports programming market in nearly all of the DMA Markets is already highly concentrated. As a result of the Transaction, Disney's networks would account for at least 60 percent of cable sports programming revenue in 19 of the DMA Markets and over 45 percent in the remaining six DMA Markets. Consequently, bringing Disney's ESPN networks and Fox's RSNs under common ownership would significantly concentrate the cable sports programming market in each of the DMA Markets.

19. Market concentration is often a useful indicator of the likely competitive effects of a merger. The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that the transaction would result in a meaningful reduction in competition that harms consumers.

20. The Herfindahl-Hirschman Index ("HHI") is a standard measure of market concentration. Under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, mergers resulting in highly concentrated markets (with an HHI in excess of 2,500) that involve an increase in the HHI of more than 200 points are presumed to be likely to enhance market power.

21. Using 2017 gross cable sports programming revenue, in each of the DMA Markets, the combination of Disney and the Fox Sale Assets would result in HHIs in excess of 2,500 and involve an increase in the HHI of more than 200. Therefore, in each DMA Market, the HHI levels are above the thresholds at which a merger is presumed likely to enhance market power.

22. For example, in the Detroit DMA Market, where Fox operates Fox Sports Detroit, the Transaction would result in a post-merger HHI of over 4,000 with an increase of over 1,400. Therefore, in this market, the Transaction results in a presumptively anticompetitive level of concentration. Similarly, the Transaction would result in presumptively anticompetitive levels of concentration in each of the other DMA Markets.

23. In addition to substantially increasing concentration levels in each of the DMA Markets, the proposed Transaction would combine cable sports networks that are at least partial substitutes. Accordingly, the proposed Transaction would likely diminish competition in the negotiation of licenses for cable sports programming with MVPDs that have subscribers in the DMA Markets. Post-acquisition, Disney would gain the ability to threaten MVPDs in each of the DMA Markets with the simultaneous blackout of two of the most significant cable networks carrying sports programming: ESPN and a local RSN. ESPN and the local Fox RSN generate the highest and second-highest affiliate fees per subscriber in most of the 25 DMAs, and they are among the networks that generate the highest affiliate fees per subscriber in every one of the 25 DMAs.

24. The threat of double blackouts in the DMA Markets—and the resulting disproportionate loss of an MVPD's subscribers and profits—likely would significantly strengthen Disney's bargaining position with MVPDs. Before the merger, an MVPD's failure to reach an agreement with Disney could result in a blackout of Disney's networks in the MVPD's footprint and threaten it with some subscriber loss. But the MVPD would still be able to offer the sports programming on Fox's RSNs during a Disney blackout, thereby minimizing subscription cancellations. After the merger, an MVPD negotiating with Disney would face the prospect of a dual blackout of ESPN and the local RSN in one or more DMA Markets, likely resulting in disproportionately

more subscriber loss. Because the leverage that a television programmer has in negotiations with the MVPD is derived at least in part from its leverage within each DMA Market in the MVPD's footprint, the threat of a dual blackout would likely cause an MVPD to accede to a demand by Disney for higher license fees. For these reasons, the loss of competition between Disney and the Fox Sale Assets in each DMA Market would likely lead to an increase in total licensing fees in each DMA Market and, because increased licensing fees typically are passed on to consumers, would result in higher subscription fees for customers of MVPDs.

## VI. ABSENCE OF COUNTERVAILING FACTORS

25. Entry would not be timely, likely or sufficient to prevent the Transaction's likely anticompetitive effects. Professional sport teams auction the exclusive rights to telecast their games under long-term contracts. Because these contracts typically last many years, there are infrequent opportunities for entrants to bid for these highly valuable licensing rights.

26. Defendants cannot demonstrate acquisition-specific and cognizable efficiencies that would be sufficient to offset the proposed acquisition's likely anticompetitive effects.

## VII. VIOLATIONS ALLEGED

27. Disney's proposed acquisition of the Fox Sale Assets likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The proposed acquisition likely would:

a. substantially lessen competition in the licensing of cable sports programming in each of the DMA Markets;

b. eliminate actual and potential competition among Disney and Fox in the licensing of cable sports programming in each of the DMA Markets; and

c. cause prices for cable sports programming in each of the DMA Markets to increase.

## VIII. REQUEST FOR RELIEF

28. The United States requests that the Court:

a. adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b. permanently enjoin and restrain Defendants from carrying out the Transaction, or entering into any other agreement, understanding, or plan by which Disney would acquire the Fox Sale Assets;

c. award the United States the costs of this action; and

d. award such other relief to the United States as the Court may deem just and proper.

Dated: June 27, 2018
Respectfully submitted,
FOR PLAINTIFF UNITED STATES OF AMERICA

MAKAN DELRAHIM
*Assistant Attorney General for Antitrust*

ANDREW C. FINCH
*Principal Deputy Assistant Attorney General*

PATRICIA A. BRINK
*Director of Civil Enforcement*

OWEN M. KENDLER
*Chief, Media, Entertainment & Professional Services Section*

YVETTE TARLOV
*Assistant Chief, Media, Entertainment & Professional Services Section*

CRAIG D. MINERVA
LEE F. BERGER
JEREMY EVANS
RACHEL FLIPSE
BRIAN HANNA
MARK MERVA
KATE RIGGS
LAUREN RIKER
MONSURA SIRAJEE
ADAM C. SPEEGLE
LOWELL STERN
United States Department of Justice, Antitrust Division, Media, Entertainment & Professional, Services Section, 450 Fifth Street NW, Suite 4000, Washington, DC 20530, Telephone: (202) 353–2384, Facsimile: (202) 514–730

## United States District Court for the Southern District of New York

*United States of America,* Plaintiff, v. *The Walt Disney Company,* and *Twenty-First Century Fox, Inc.,* Defendants.

## PROPOSED FINAL JUDGMENT

WHEREAS, Plaintiff, the United States of America, filed its Complaint on June 27, 2018, and defendant The Walt Disney Company ("Disney") and defendant Twenty-First Century Fox, Inc. ("Fox"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Disney to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Disney to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Disney has represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

This Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. DEFINITIONS

As used in this Final Judgment:

A. "Disney" means defendant The Walt Disney Company, a Delaware corporation headquartered in Burbank, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B. "Fox" means defendant Twenty-First Century Fox, Inc., a Delaware corporation headquartered in New York, New York, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C. "Acquirer" means an entity to which defendants divest any of the Divestiture Assets.

D. "Fox RSNs" means all of Fox's interests in the following video networks or programming assets:
(1) Fox Sports Arizona;
(2) Fox Sports Carolinas;
(3) Fox Sports Detroit;
(4) Fox Sports Florida;
(5) Fox Sports Indiana;
(6) Fox Sports Kansas City;
(7) Fox Sports Midwest;
(8) Fox Sports New Orleans;
(9) Fox Sports North;
(10) Fox Sports Ohio;

(11) SportsTime Ohio;
(12) Fox Sports Oklahoma;
(13) Fox Sports San Diego;
(14) Fox Sports South;
(15) Fox Sports Southeast;
(16) Fox Sports Southwest;
(17) Fox Sports Sun;
(18) Fox Sports Tennessee;
(19) Fox Sports West;
(20) Prime Ticket;
(21) Fox Sports Wisconsin; and
(22) the YES Network.

E. ''Divestiture Assets'' means all of Fox's interests in the Fox RSNs, including all of the assets, tangible or intangible, necessary for the operations of the Fox RSNs as viable, ongoing video networks or programming assets, including, but not limited to, all real property (owned or leased), all broadcast equipment, office furniture, fixtures, materials, supplies, and other tangible property; all licenses, permits and authorizations issued by any governmental organization relating to the operation of the asset; all contracts (including content, programming and distribution contracts and rights), agreements (including transition services agreements), leases, and commitments and understanding of defendants; all trademarks, service marks, trade names, copyrights, patents, slogans, programming materials, and promotional materials relating to each video network; all customer lists, contracts, accounts, credit records, and all logs and other records maintained by Fox in connection with each video network. Except as set forth in Paragraph IV(H) of this Final Judgment, Divestiture Assets do not include trademarks, trade names, service marks, or service names containing the name ''Fox.''

F. The term ''Transaction'' means the transaction that is the subject of the Agreement and Plan of Merger among Twenty-First Century Fox, Inc., The Walt Disney Company, TWDC Holdco 613 corp., WDC Merger Enterprises II Corp., and WDC Merger Enterprises I, LLC, dated June 20, 2018.

## III. APPLICABILITY

A. This Final Judgment applies to Disney and Fox, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. If, after the closing and prior to complying with Section IV and Section V of this Final Judgment, Disney sells or otherwise disposes of all or substantially all of the assets or lesser business units that include the Divestiture Assets, it shall require the purchaser to be bound by the provisions of this Final Judgment. Disney need not obtain such an agreement from the Acquirer(s) of the assets divested pursuant to this Final Judgment.

## IV. DIVESTITURES

A. Disney is ordered and directed, within ninety (90) calendar days after the closing of the Transaction, or five (5) calendar days after notice of entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to one or more Acquirers acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed ninety (90) calendar days in total, and shall notify the Court in such circumstances. With respect to divestiture of the Divestiture Assets by Disney or a trustee appointed pursuant to Section V of this Final Judgment, Disney agrees to use its best efforts to divest the Divestiture Assets as expeditiously as possible after the closing of the Transaction. For the avoidance of doubt, nothing in this Final Judgment shall require Fox to divest any of the Divestiture Assets prior to the closing of the Transaction.

B. In accomplishing the divestiture ordered by this Final Judgment, Disney promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Disney shall inform any person making an inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process, except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C. Defendants shall provide the Acquirer(s) and the United States information relating to the personnel involved in the production and operation of the Divestiture Assets to enable the Acquirer(s) to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer(s) to employ upon closing of the sale of each of the Divestiture Assets any defendant employee whose primary responsibility is the production and operation of the Divestiture Assets.

D. Defendants shall permit the prospective Acquirer(s) of the Divestiture Assets to have reasonable access to personnel and to make inspections of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E. Disney shall warrant to the Acquirer(s) that each Divestiture Asset will be operational on the date of sale.

F. Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

G. Disney shall warrant to the Acquirer(s) (1) that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of each Divestiture Asset, and (2) that following the sale of the Divestiture Assets, Disney will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

H. Notwithstanding Paragraph II(E), that the Divestiture Assets do not include trademarks, trade names, service marks, or service names containing the name ''Fox,'' the defendants shall offer any Acquirer(s) of a Fox RSN a non-exclusive royalty-free license for use of the ''Fox'' trademark consistent with that RSN's current usage of that trademark for a time period of at least eighteen (18) months.

I. At the option of Acquirer(s), on or before the closing date of any divestiture, Disney shall enter into one or more transition services agreements, approved in advance by the United States in its sole discretion, to provide any transition services reasonably necessary to operate any Divestiture Assets as viable, ongoing video networks or programming assets.

J. Unless the United States otherwise consents in writing, the divestitures pursuant to Section IV, or by trustee appointed pursuant to Section V of this Final Judgment, shall include the entire Divestiture Assets and be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business of selling, supplying, or licensing video programming. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of

the United States that the Divestiture Assets will remain viable, and the divestiture of such assets will achieve the purposes of this Final Judgment and remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment:

(1) shall be made to an Acquirer(s) that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the business of selling, supplying, and licensing video programming; and

(2) shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between the Acquirer(s) and defendants gives defendants the ability unreasonably to raise the costs of the Acquirer(s), to lower the efficiency of the Acquirer(s), or otherwise to interfere in the ability of the Acquirer(s) to compete effectively.

## V. APPOINTMENT OF TRUSTEE

A. If Disney has not divested the Divestiture Assets within the time period specified in Section IV(A), Disney shall notify the United States of that fact in writing, specifically identifying the Divestiture Assets that have not been divested (the "relevant Divestiture Assets"). Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the relevant Divestiture Assets.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the relevant Divestiture Assets. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V(D) of this Final Judgment, the trustee may hire at the cost and expense of Disney any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the divestiture. Any such investment bankers, attorneys, or other agents shall serve on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications.

C. Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D. The trustee shall serve at the cost and expense of Disney pursuant to a written agreement, on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications. The trustee shall account for all monies derived from the sale of the relevant Divestiture Assets and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services yet unpaid and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Disney and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the relevant Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount. If the trustee and Disney are unable to reach agreement on the trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within 14 calendar days of appointment of the trustee, the United States may, in its sole discretion, take appropriate action, including making a recommendation to the Court. The trustee shall, within three (3) business days of hiring any other professionals or agents, provide written notice of such hiring and the rate of compensation to defendants and the United States.

E. Disney shall use its best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other agents retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Disney shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable privileges. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F. After its appointment, the trustee shall file monthly reports with the United States and, as appropriate, the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee's reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the relevant Divestiture Assets.

G. If the trustee has not accomplished the divestitures ordered under this Final Judgment within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such report contains information that the trustee deems confidential, such report shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

H. If the United States determines that the trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute trustee.

## VI. NOTICE OF PROPOSED DIVESTITURE

A. Within two (2) business days following execution of a definitive divestiture agreement, Disney or the trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestiture required by Section IV or Section V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or

desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B. Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirers. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Paragraph V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Paragraph V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. FINANCING

Disney shall not finance all or any part of any purchase made pursuant to Section IV or Section V of this Final Judgment.

## VIII. HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. After the Transaction has been consummated or closed, defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. AFFIDAVITS

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has

been completed under Section IV or Section V of this Final Judgment, defendants shall deliver to the United States an affidavit, signed by each defendant's Chief Financial Officer and General Counsel, which shall describe the fact and manner of defendant's compliance with Section IV or Section V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for and complete the sale of the Divestiture Assets, including efforts to secure regulatory approvals, and to provide required information to prospective Acquirers, including the limitations, if any, on such information.

Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitations on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendant's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## X. COMPLIANCE INSPECTION

A. For the purposes of determining or securing compliance with this Final Judgment, or of any related orders such as any Hold Separate Stipulation and Order, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United

States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

(1) access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard copies or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

(2) to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, ''Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure,'' then the United States shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. NO REACQUISITION

Disney may not reacquire any of the Divestiture Assets during the term of this Final Judgment without prior written approval of the United States.

## XII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII. ENFORCEMENT OF FINAL JUDGMENT

A. The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including its right to seek an order of contempt from this Court. Defendants agree that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of the decree and the appropriateness of any remedy therefor by a preponderance of the evidence, and they waive any argument that a different standard of proof should apply.

B. The Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition harmed by the challenged conduct. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C. In any enforcement proceeding in which the Court finds that the defendants have violated this Final Judgment, the United States may apply to the Court for a one-time extension of this Final Judgment, together with such other relief as may be appropriate. In connection with any successful effort by the United States to enforce this Final Judgement against a Defendant, whether litigated or resolved prior to litigation, that Defendant agrees to reimburse the United States for any attorneys' fees, experts' fees, and costs incurred in connection with that enforcement effort, including the investigation of the potential violation.

## XIV. EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire seven (7) years from the date of its entry, except that this Final Judgment may be terminated upon notice by the United States to the Court and the defendants that the divestitures have been completed and that the continuation of the Final Judgment no longer is necessary.

## XV. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon, and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and responses to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _____

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16

_____

United States District Judge

## United States District Court for the Southern District of New York

*United States of America,* Plaintiff, v. *The Walt Disney Company,* and *Twenty-First Century Fox, Inc.,* Defendants.

Civil Action No. 1:18–cv–05800 (CM) (KNF)

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. Definitions

As used in this Hold Separate Stipulation and Order:

A. "Acquirer" or "Acquirers" means the entity or entities to which defendants divest any of the Divestiture Assets.

B. "Disney" means defendant The Walt Disney Company, a Delaware corporation headquartered in Burbank, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C. "Fox" means defendant Twenty-First Century Fox, Inc., a Delaware corporation headquartered in New York, New York, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

D. "Fox RSNs" means all of Fox's interests in the following video networks or programming assets:

(1) Fox Sports Arizona;
(2) Fox Sports Carolinas;
(3) Fox Sports Detroit;
(4) Fox Sports Florida;
(5) Fox Sports Indiana;
(6) Fox Sports Kansas City;
(7) Fox Sports Midwest;
(8) Fox Sports New Orleans;
(9) Fox Sports North;
(10) Fox Sports Ohio;
(11) SportsTime Ohio;
(12) Fox Sports Oklahoma;
(13) Fox Sports San Diego;
(14) Fox Sports South;
(15) Fox Sports Southeast;
(16) Fox Sports Southwest;
(17) Fox Sports Sun;
(18) Fox Sports Tennessee;
(19) Fox Sports West;
(20) Prime Ticket;
(21) Fox Sports Wisconsin; and
(22) the YES Network.

E. "Divestiture Assets" means all of Fox's interests in the Fox RSNs, including, all of the assets, tangible or intangible, necessary for the operations of the Fox RSNs as viable, ongoing video networks or programming assets, including, but not limited to, all real property (owned or leased), all broadcast equipment, office furniture, fixtures, materials, supplies, and other tangible property; all licenses, permits and authorizations issued by any governmental organization relating to the operation of the asset; all contracts (including content, programming and distribution contracts and rights), agreements (including transition services agreements), leases, and commitments and understanding of defendants; all trademarks, service marks, trade names, copyrights, patents, slogans, programming materials, and promotional materials relating to each video network; all customer lists, contracts, accounts, credit records, and all logs and other records maintained by Fox in connection with each video network. Except as provided in the Final Judgment, Divestiture Assets does not include trademarks, trade names, service marks, or service names containing the name "Fox."

F. The term "Transaction" means the transaction that is the subject of the Agreement and Plan of Merger among Twenty-First Century Fox, Inc., The

Walt Disney Company, TWDC Holdco 613 corp., WDC Merger Enterprises II Corp., and WDC Merger Enterprises I, LLC, dated June 20, 2018.

## II. Objectives

The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Divestiture Assets for the purpose of establishing one or more viable competitors in the sale, supply, or licensing of video programming in the United States in order to remedy the effects that the United States alleges would otherwise result from the Transaction. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Divestiture Assets will remain economically viable, and ongoing business concerns that will remain independent and uninfluenced by Disney or, after the Transaction has been consummated, by Fox, and that competition is maintained during the pendency of the ordered divestitures.

## III. Jurisdiction and Venue

The Court has jurisdiction over the subject matter of this action and over each of the parties hereto, and venue of this action is proper in the United States District Court for the Southern District of New York.

## IV. Compliance with and Entry of the Proposed Final Judgment

A. The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on the defendants and by filing that notice with the Court. Disney agrees to arrange, at its expense, publication as quickly as possible of the newspaper notice required by the APPA, which shall be drafted by the United States, in its sole discretion. The publication shall be arranged no later than three business days after defendants' receipt from the United States of the text of the notice and the identity of the newspaper within which the publication shall be made. Disney shall promptly send to the United States (1) confirmation that publication of the newspaper notice has been arranged, and (2) the certification of the publication prepared by the newspaper within which the notice was published.

B. Defendants shall abide by and comply with the provisions of the proposed Final Judgment pending the Final Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment. The United States shall have the full rights and enforcement powers in the proposed Final Judgment as though the same were in full force and effect as the Final Order of the Court.

C. Defendants shall not consummate the Transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation.

D. This Hold Separate Stipulation and Order shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E. In the event (1) the United States has withdrawn its consent, as provided in Paragraph IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Hold Separate Stipulation and Order, the time has expired for all appeals of any court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Hold Separate Stipulation and Order, and the making of this Hold Separate Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

F. Disney represents that the divestitures ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. Notice of Compliance

. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, and every thirty (30) calendar days thereafter (1) Fox shall deliver to the United States an affidavit, signed by Fox's Chief Financial Officer and General Counsel, which shall describe the fact and manner of Fox's compliance with Section VI until defendants consummate the Transaction; and

(2) Disney shall deliver to the United States an affidavit, signed by Disney's Chief Financial Officer and General

Counsel, which shall describe the fact and manner of Disney's compliance with Section VII until the divestitures required by the Final Judgment have been accomplished.

## VI. Pre-Closing Asset Preservation Provisions

Until defendants consummate the Transaction:

A. Fox shall preserve, maintain, and continue to operate each Divestiture Asset as an ongoing, economically viable, competitive video network or programming asset.

B. Fox shall take all steps reasonably necessary to ensure that the Divestiture Assets will be maintained and operated as ongoing, economically viable and active competitors in the video network or programming business.

C. Fox shall use all reasonable efforts, consistent with past practices, to maintain and increase the sales and revenues associated with each of the Divestiture Assets.

D. Fox, consistent with past practices, shall provide sufficient working capital and lines and sources of credit to continue to maintain each Divestiture Asset as an ongoing, economically viable, and competitive video network or programming asset.

E. Fox shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of each of the Divestiture Assets.

F. Fox shall preserve the existing relationships between the Divestiture Assets and with each customer that advertises on or licenses content to a Divestiture Asset, each distributor that licenses content from a Divestiture Asset, and with others having business relations with any of the Divestiture Assets, in accordance with the ordinary course of business.

## VII. Post-Closing Hold Separate and Asset Preservation Provisions

Once the Transaction has been consummated and until the divestitures required by the Final Judgment have been accomplished:

A. Disney shall preserve, maintain, and continue to operate each Divestiture Asset as an independent, ongoing, economically viable, competitive video network or programming asset, management, programming, distribution, sales and operations of such assets held entirely separate, distinct and apart from those of Disney's

other operations. Disney shall not coordinate its programming, production, distribution, marketing, content purchases, or terms of sale of any products with those of any of the Divestiture Assets.

B. Disney shall take all steps necessary to ensure that (1) the Divestiture Assets will be maintained and operated as independent, ongoing, economically viable and active competitors in the video network or programming business; (2) management of the Divestiture Assets will not be influenced by Disney; and (3) the books, records, competitively sensitive production, programming, distribution, sales, content purchases, marketing and pricing information, and decision making concerning production, programming, distribution, sales, content purchases, pricing and marketing by or under any of the Divestiture Assets will be kept separate and apart from Disney's other operations.

C. Disney shall use all reasonable efforts to maintain and increase the sales and revenues associated with each of the Divestiture Assets, and shall maintain at 2018 or previously approved levels for 2017, whichever is higher, all promotional, advertising, sales, technical assistance, marketing and other support for each of the Divestiture Assets.

D. Disney shall provide sufficient working capital and lines and sources of credit to continue to maintain each Divestiture Asset as an ongoing, economically viable, and competitive video network or programming asset.

E. Disney shall not, except as part of a divestiture approved by the United States in accordance with the proposed Final Judgment, remove, sell, lease, assign, transfer, destroy, pledge, or otherwise dispose of any of the Divestiture Assets.

F. Disney shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of each of the Divestiture Assets.

G. Disney shall preserve the existing relationships between the Divestiture Assets and with each customer that advertises on or licenses content to a Divestiture Asset, each distributor that licenses content from a Divestiture Asset, and with others having business relations with any of the Divestiture Assets, in accordance with the ordinary course of business.

H. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets.

I. Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the proposed Final Judgment to fulfill its obligations.

J. Disney shall appoint a person or persons to oversee the Divestiture Assets, who also will be responsible for defendants' compliance with this section. Such person or persons shall have complete managerial responsibility for the Divestiture Assets, subject to the provisions of this Final Judgment. In the event such person is unable to perform such duties, Disney shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should Disney fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

## VIII. Duration of Hold Separate Obligations

Defendants' obligations under Section VI and VII of this Hold Separate Stipulation and Order shall remain in effect until (1) consummation of the divestitures required by the proposed Final Judgment or (2) until further order of the Court. If the United States voluntarily dismisses the Complaint in this matter, defendants are released from all further obligations under this Hold Separate Stipulation and Order.

Dated: June 27, 2018

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA

Craig Minerva
United States Department of Justice, Antitrust Division, Media, Entertainment & Professional Services Section, 450 Fifth Street N.W., Suite 4000, Washington, DC 20530, Telephone: (202) 353–2384, Facsimile: (202) 514–730

FOR DEFENDANT THE WALT DISNEY COMPANY

COVINGTON & BURLING LLP

Andrew A. Ruffino
(*aruffino@cov.com*)
The New York Times Building, 620 Eighth Avenue, New York, New York 10018, (212) 841–1097
Thomas O. Barnett
(*tbarnett@cov.com*)
(*pro hac vice application forthcoming*)
Anne Y. Lee
(*alee@cov.com*)
James Dean
(*jdean@cov.com*)
Megan Gerking (*mgerking@cov.com*)
One CityCenter, 850 10th Street NW, Washington, DC 20001, (202) 662–6000

Kenneth Newman
(*Ken.Newman@disney.com*)
Associate General Counsel and Assistant Secretary, The Walt Disney Company, 77 West 66th Street, 15th Floor, New York, NY 10023, (212) 456–6080

FOR DEFENDANT
TWENTY-FIRST CENTURY FOX, INC.

CLEARY GOTTLIEB STEEN & HAMILTON LLP

George S. Cary
(*pro hac vice application forthcoming*)
Kenneth S. Reinker
Tara Lynn Tavernia
(*pro hac vice application forthcoming*)
2000 Pennsylvania Avenue NW, Washington, DC 20006, Phone: (202) 974–1743, Fax: (202) 974–1999, *gcary@cgsh.com, kreinker@cgsh.com, ttavernia@cgsh.com*

*ORDER*

IT IS SO ORDERED by the Court, this ____ day of ____, 2018.

_____
United States District Judge

## United States District Court for the Southern District of New York

United States of America, Plaintiff, v. The Walt Disney Company, and Twenty-First Century Fox, Inc., Defendants.

Civil Action No. 18–CV–5800 (CM) (KNF)

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)–(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Defendants The Walt Disney Company ("Disney") and Twenty-First Century Fox, Inc. ("Fox") (collectively, "Defendants") entered into an Agreement and Plan of Merger dated December 13, 2017, amended on June 20, 2018, pursuant to which Disney agreed to acquire certain assets, including Fox's ownership of, or interests in, twenty-two regional sports networks ("RSNs"), the FX cable networks, the National Geographic cable networks, television and film studios, Hulu, and international television businesses (the "Fox Sale Assets") from Fox for approximately $71.3 billion (the "Transaction").

Specifically, Fox proposes to sell to Disney its interests in the following RSNs: (i) Fox Sports Arizona; (ii) Fox Sports Carolinas; (iii) Fox Sports Detroit; (iv) Fox Sports Florida; (v) Fox

Sports Indiana; (vi) Fox Sports Kansas City; (vii) Fox Sports Midwest; (viii) Fox Sports New Orleans; (ix) Fox Sports North; (x) Fox Sports Ohio; (xi) SportsTime Ohio; (xii) Fox Sports Oklahoma; (xiii) Fox Sports San Diego; (xiv) Fox Sports South; (xv) Fox Sports Southeast; (xvi) Fox Sports Southwest; (xvii) Fox Sports Sun; (xviii) Fox Sports Tennessee; (xix) Fox Sports West; (xx) Prime Ticket; (xxi) Fox Sports Wisconsin; and (xxii) the YES Network.

The proposed acquisition would combine two of the country's most valuable cable sports properties—Disney's ESPN franchise of networks and Fox's portfolio of twenty-two RSNs. Cable sports television networks compete to be carried in the programming packages that distributors, such as cable companies (e.g., Charter Communications and Comcast), direct broadcast satellite services (e.g., DISH Network and DirecTV), fiber optic networks services (e.g., Verizon's Fios and CenturyLink's Prism TV), and online distributors of linear cable programming (e.g., Hulu Live and DISH's Sling TV) (hereinafter, collectively referred to as "MVPDs") offer to their subscribers. Consequently, Disney's proposed acquisition of Fox's portfolio of RSNs would end the head-to-head competition between them and likely would result in higher prices for cable sports programming in each of the Designated Market Areas ("DMAs") in which Disney and Fox compete.

The United States filed a civil antitrust Complaint on June 27, 2018, seeking to enjoin the proposed Transaction. The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially for the licensing of cable sports programming to MVPDs in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, in each of the following twenty-five DMAs: Phoenix, Arizona; Detroit, Michigan; Milwaukee, Wisconsin; Cleveland, Ohio; Cincinnati, Ohio; Columbus, Ohio; Miami, Florida; Oklahoma City, Oklahoma; Tampa Bay, Florida; Dallas, Texas; St. Louis, Missouri; Atlanta, Georgia; Indianapolis, Indiana; Orlando, Florida; San Antonio, Texas; Minneapolis, Minnesota; Nashville, Tennessee; Memphis, Tennessee; San Diego, California; Raleigh-Durham, North Carolina; New Orleans, Louisiana; Kansas City, Kansas; Charlotte, North Carolina; Los Angeles, California; and New York, New York (collectively, the "DMA Markets"). This loss of competition likely would result in increased MVPD licensing fees in each DMA Market and because licensing fees typically are passed onto

consumers, higher subscription fees for MVPD customers.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the likely anticompetitive effects of the Transaction. Under the proposed Final Judgment, which is explained more fully below, Disney is required to divest all of Fox's interests in the Fox RSNs, including all assets necessary for the operation of each Fox RSN as a viable, ongoing cable sports programming network, to one or more buyers acceptable to the United States, in its sole discretion. Under the terms of the Hold Separate Stipulation and Order, Disney and Fox will take certain steps to ensure that each Fox RSN continues to operate as an ongoing, economically viable, competitive cable sports programming network that will remain independent and uninfluenced by the consummation of the Transaction, and that competition is maintained during the pendency of the ordered divestiture.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. The Defendants and the Proposed Transaction

Disney is a Delaware corporation headquartered in Burbank, California. It reported revenue of $55 billion for fiscal year 2017. Disney owns various television programming assets, including 80% of ESPN—a sports entertainment company that operates several national cable sports programming networks. Disney's other programming assets include: (i) the ABC television network; (ii) eight owned-and-operated ABC broadcast stations; (iii) Disney-branded cable television networks; and (iv) Freeform, a cable television network geared toward teenagers and young adults. Disney licenses its cable programming networks to MVPDs throughout the United States.

Fox is a Delaware corporation headquartered in New York, New York. It reported revenue of $28.5 billion for fiscal year 2017. The Fox Sale Assets,

which include several cable television programming networks and all of the Fox RSNs, generated $19 billion in revenue in fiscal year 2017. Fox licenses its cable programming networks to MVPDs throughout the United States. The Fox Sale Assets do not include Fox Business Network, Fox Broadcasting Company, Fox Sports, Fox Television Stations Group, FS1, FS2, Fox Deportes, or the Big Ten Network.

Collectively, the twenty-two Fox RSNs serve approximately 61 million subscribers in twenty-five separate DMA Markets and license local and regional rights to telecast live games of 44 of 91 (48%) U.S. professional sports teams in three of the four major sports leagues: Major League Baseball ("MLB"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL"). More specifically, the Fox RSNs have the local or regional broadcast rights to 15 of 30 (50%) MLB teams, 17 of 30 (57%) NBA teams, and 12 of 31 (39%) NHL teams.

The proposed Transaction would likely lessen competition substantially in each of the DMA Markets as a result of Disney's acquisition of Fox's RSNs. This Transaction is the subject of the Complaint and proposed Final Judgment filed by the United States on June 27, 2018.

### B. The Transaction's Likely Anticompetitive Effects

#### 1. Relevant Markets

The Complaint alleges that licensing of cable sports programming to MVPDs in each DMA Market constitutes a relevant market under Section 7 of the Clayton Act.

Cable sports programming includes cable television networks that program a substantial portion of their programming time to airing live sporting events, including MLB, NBA, and NHL games. Consumers that view live sporting events are an important customer group for MVPDs. MVPDs could not attract or retain those consumers as subscribers without including cable sports programming in the packages of cable programming networks they offer their subscribers. ESPN and the local Fox RSN generate the highest and second-highest affiliate fees per subscriber of all networks carried by an MVPD in most of the 25 DMAs and they are among the networks that generate the highest affiliate fees per subscriber in every one of the 25 DMAs. The high per-subscriber fees that MVPDs pay to license these networks reflects the importance of these networks to MVPDs and their subscribers.

For MVPDs, sports programming on broadcast television is unlikely a sufficient substitute for cable sports programming. MVPDs do not typically consider broadcast networks as providing the same type of content as cable sports networks like ESPN and the RSNs. Broadcast networks and their affiliates aim to have broad appeal by offering a variety of highly-rated programming content including primetime entertainment shows, syndicated shows, and local and national news and weather, with live sports events making up a small percentage of a broadcast network's airtime. Many MVPD customers demand programming focused on, if not dedicated to, live sporting events, and a broadcast network's occasional programming of live sporting events does not suffice for many customers. For that reason, MVPDs do not typically consider broadcast network programming as a replacement for cable sports programming.

With respect to the licensing of cable sports programming to MVPDs, each DMA Market constitutes a separate relevant geographic market under Section 7 of the Clayton Act. A DMA is a geographic unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes MVPDs, among others, with data to aid in evaluating audience size and composition in a particular area. DMAs are widely accepted by MVPDs as the standard geographic area to use in evaluating television audience size and demographic composition. The Federal Communications Commission also uses DMAs as geographic units with respect to its MVPD regulations.

## 2. Harm to Competition in Each of the DMA Markets

The Complaint alleges that the proposed Transaction likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and have the following effects, among others:

a. substantially lessen competition in the licensing of cable sports programming to MVPDs in each of the DMA Markets;

b. eliminate actual and potential competition among Disney and Fox in the licensing of cable sports programming to MVPDs in each of the DMA Markets; and

c. cause prices for cable sports programming to MVPDs in each of the DMA Markets to increase.

The Transaction, by eliminating the Fox RSNs as separate competitors and combining their operations under common ownership and control with ESPN, would allow Disney to increase its market share of cable sports programming in each DMA Market and likely increase licensing fees to MVPDs for ESPN and/or the Fox RSNs. As a result of the Transaction, Disney's networks would account for at least 60 percent of cable sports programming in 19 of the DMA Markets and over 45 percent in the remaining six DMA Markets.

As alleged in the Complaint, Disney's acquisition of the Fox RSNs would further concentrate already highly concentrated cable sports programming markets in each of the DMA Markets. Using the Herfindahl-Hirschman Index ("HHI"), a standard measure of market concentration, the post-acquisition HHI in each of the DMA Markets would exceed 2,500 and the Transaction would increase each DMA Market's HHI by over 200 points. As a result, the proposed Transaction is presumed to likely enhance market power under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission.

Moreover, the Transaction combines networks that are at least partial substitutes and therefore competitors in a product market with limited alternatives. The Transaction would provide Disney with the ability to threaten MVPDs in each of the DMA Markets with the simultaneous blackout of at least two major cable sports programming networks: the ESPN networks and the local Fox RSN, thereby diminishing competition in the negotiation of licensing agreements with MVPDs in each of the DMA markets.

The threatened loss of cable sports programming, and the resulting diminution of an MVPD's subscribers and profits, would significantly strengthen Disney's bargaining position. Prior to the Transaction, an MVPD's failure to reach a licensing agreement with Disney would result in the blackout of Disney's networks, including ESPN, and threaten some subscriber loss for the MVPD, including those subscribers that value ESPN's content. But because the MVPD still would be able to offer its subscribers the local Fox RSN, many MVPD subscribers simply would watch the local RSN instead of cancelling their MVPD subscriptions. In the event of a Fox RSN blackout, many subscribers likely would switch to watching ESPN. After the Transaction, an MVPD negotiating with Disney would be faced with the prospect of a dual blackout of significant cable sports programming, a result more likely to cause the MVPD to lose incremental subscribers (that it would not have lost in a pre-transaction blackout of only ESPN or the Fox RSN) and therefore accede to Disney's demand for higher licensing fees. For these reasons, the loss of competition between ESPN and the Fox RSN in each DMA Market would likely lead to an increase in MVPD licensing fees in those markets. Some of these increased programming costs likely would be passed onto consumers, resulting in higher MVPD subscription fees for millions of U.S. households.

## 3. Entry

The Complaint alleges that entry or expansion into cable sports programming would not be timely, likely, or sufficient to prevent the Transaction's anticompetitive effects. With respect to RSN sports programming, there are a limited number of professional sports teams in a given DMA, and these teams auction the exclusive local rights to telecast their games under long-term contracts. Because these contracts typically last many years, there are infrequent opportunities to bid for these licensing rights to expand an existing RSN or create a new RSN. Moreover, non-local RSNs cannot enter because their licenses typically are limited to the DMAs that comprise the "home" territory of the team or teams that the RSN carries; and local MVPD subscribers would not generally have demand for extensive coverage of another DMA's home team. Thus, an MVPD cannot substitute an RSN from another DMA for the local RSN in response to an anticompetitive price increase.

Entry or expansion into national cable sports programming also is difficult. For a national sports network to compete effectively, it needs to obtain the national broadcast rights from professional sports leagues (i.e., MLB, NBA, and NHL), which are expensive and infrequently available. Although both Fox and NBCUniversal have national cable sports programming networks (FS1 and NBC Sports, respectively), neither company has been able to replicate ESPN's competitive position (as evidenced by their lower MVPD licensing fees and viewership ratings).

## III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture requirement of the proposed Final Judgment will eliminate the likely anticompetitive effects of the Transaction in each DMA Market by establishing an independent and economically viable competitor. The proposed Final Judgment requires

Disney, within 90 days after the closing of the Transaction, or five days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest all of Fox's interests in the Fox RSNs, including all assets necessary for the operation of the Fox RSNs as viable, ongoing video networks or programming assets. The assets must be divested in such a way as to satisfy the United States in its sole discretion that the operations can and will be operated by the purchaser as viable, ongoing businesses that can compete effectively in the relevant markets. Disney must use its best efforts to divest the Fox RSNs as expeditiously as possible and shall cooperate with prospective purchasers.

In the event that Disney does not accomplish the divestiture within the period prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture. If a trustee is appointed, the proposed Final Judgment provides that Disney will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

The proposed Final Judgment also contains provisions designed to promote compliance and make the enforcement of Division consent decrees as effective as possible. Paragraph XIII(A) provides that the United States retains and reserves all rights to enforce the provisions of the proposed Final Judgment, including its rights to seek an order of contempt from the Court. Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence, and Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.

Paragraph XIII(B) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment was drafted to restore all competition that would otherwise be harmed by the merger. Defendants agree that they will abide by the proposed Final Judgment, and that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XIII(C) of the proposed Final Judgment further provides that, should the Court find in an enforcement proceeding that Defendants have violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate. In addition, in order to compensate American taxpayers for any costs associated with the investigation and enforcement of violations of the proposed Final Judgment, Paragraph XIII(C) provides that in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved prior to litigation, that Defendant agrees to reimburse the United States for attorneys' fees, experts' fees, and costs incurred in connection with any enforcement effort, including the investigation of the potential violation.

Finally, Section XIV of the proposed Final Judgment provides that the Final Judgment shall expire seven years from the date of its entry, except that the Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestitures have been completed and that the continuation of the Final Judgment is no longer necessary.

The divestiture provisions of the proposed Final Judgment will eliminate the likely anticompetitive effects of the acquisition in the provision of cable sports programming in the DMA Markets.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the **Federal Register**, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the **Federal Register**.

Written comments should be submitted to:

Owen M. Kendler, Chief, Media, Entertainment & Professional Services Section Antitrust Division, United States Department of Justice, 450 Fifth Street, N.W., Suite 4000, Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final

Judgment, a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Disney's acquisition of the Fox RSNs. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of cable sports programming in the DMA Markets identified by the United States. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment ''is in the public interest.'' 15 U.S.C. § 16(e)(1); *see also United States* v. *Int'l Bus. Mach. Corp.,* 163 F.3d 737, 740 (2d Cir. 1998). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States* v. *Keyspan,* 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011) (discussing Tunney Act standards); *United States* v. *Morgan Stanley,* 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (similar). In considering these statutory

factors, the court's inquiry is necessarily a limited one as the government is entitled to ''broad discretion to settle with the defendant within the reaches of the public interest.'' *United States* v. *Microsoft Corp.,* 56 F.3d 1448, 1461 (D.C. Cir. 1995); *accord United States* v. *Alex. Brown & Sons, Inc.,* 963 F. Supp. 235, 238 (S.D.N.Y. 1997) (quoting *Microsoft,* 56 F.3d at 1460, *aff'd sub nom. United States* v. *Bleznak,* 153 F.3d 16 (2d Cir. 1998)); *Keyspan,* 763 F. Supp. 2d at 637 (same).

Under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft,* 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, ''[t]he Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will *best* serve society, but only to ensure that the resulting settlement is within the reaches of the public interest.'' *Morgan Stanley,* 881 F. Supp. 2d at 567 (quoting *Alex. Brown & Sons,* 963 F. Supp. at 238) (internal quotations omitted) (emphasis in original). In making this determination, ''[t]he [c]ourt is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable. [Rather], the relevant inquiry is whether there is a factual foundation for the government's decision such that its conclusions regarding the proposed settlement are reasonable.'' *Morgan Stanley,* 881 F. Supp. 2d at 563 (quoting *United States* v. *Abitibi-Consolidated Inc.,* 584 F. Supp. 2d 162, 165 (D.D.C. 2008)); *see also United States* v. *Apple, Inc.,* 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012); *Alex. Brown & Sons,* 963 F. Supp. at 238.[1] The government's predictions about the efficacy of its remedies are entitled to deference. *Apple,* 889 F. Supp. 2d at 631 (citation omitted).[2]

---

[1] *See also United States* v. *Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir. 1981) (''The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.''); *see generally Microsoft,* 56 F.3d at 1461 (discussing whether ''the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest''').

[2] *See Microsoft,* 56 F.3d at 1461 (noting the need for courts to be ''deferential to the government's predictions as to the effect of the proposed remedies''); *United States* v. *Archer-Daniels-Midland Co.,* 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. ''[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' '' *United States* v. *Am. Tel. & Tel. Co.,* 552 F. Supp. 131, 151 (D.D.C. 1982) (citation omitted) (quoting *United States* v. *Gillette Co.,* 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland* v. *United States,* 460 U.S. 1001 (1983); *see also United States* v. *US Airways Grp., Inc.,* 38 F. Supp. 3d 69, 74 (D.D.C. 2014) (noting that room must be made for the government to grant concessions in the negotiation process for settlements) (citing *Microsoft,* 56 F.3d at 1461); *Morgan Stanley,* 881 F. Supp. 2d at 568 (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States ''need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.'' *United States* v. *SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1, 17 (D.D.C. 2007).

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to ''construct [its] own hypothetical case and then evaluate the decree against that case.'' *Microsoft,* 56 F.3d at 1459; *see also Morgan Stanley,* 881 F. Supp. 2d at 567 (''A court must limit its review to the issues in the complaint and 'give due respect to the [Government's] perception of . . . its case.''') (quoting *Microsoft,* 56 F.3d at 1461); *United States* v. *InBev N.V./S.A.,* No. 08–1965 (JR), 2009–2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *20, (D.D.C. Aug. 11, 2009) (''the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged.''). Because the ''court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place,'' it follows that ''the court is only authorized to review the decree itself,'' and not to ''effectively redraft the complaint'' to inquire into other matters that the United States did not pursue. *Microsoft,* 56 F.3d at 1459–

---

proposed remedies, its perception of the market structure, and its views of the nature of the case).

60. Courts cannot look beyond the complaint in making the public interest determination "unless the complaint underlying the decree is drafted so narrowly such that its entry would appear 'to make a mockery of judicial power.'" *Apple,* 889 F. Supp. 2d at 631 (S.D.N.Y. 2012) (citing *SBC Commc'ns,* 489 F. Supp. 2d at 15).

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways,* 38 F. Supp. 3d at 75 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24, 598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns,* 489 F. Supp. 2d at 11; *see also Apple,* 889 F. Supp. 2d at 632 ("[P]rosecutorial

functions vested solely in the executive branch could be undermined by the improper use of the APPA as an antitrust oversight provision.") (citation omitted). A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *U.S. Airways,* 38 F. Supp. 3d at 75.[3]

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: August 7, 2018
Respectfully submitted,

Lowell R. Stern

United States Department of Justice, Antitrust Division, Media, Entertainment & Professional Services Section, 450 Fifth Street, N.W., Suite 4000, Washington, DC 20530, Telephone: (202) 514–3676, Facsimile: (202) 514–7308, E-mail: *lowell.stern@usdoj.gov*
Attorney for Plaintiff United States

[FR Doc. 2018–17521 Filed 8–14–18; 8:45 am]

**BILLING CODE 4410–11–P**

## DEPARTMENT OF JUSTICE

**Drug Enforcement Administration**

**[Docket No. DEA–392]**

**Bulk Manufacturer of Controlled Substances Application: Rhodes Technologies**

**ACTION:** Notice of application.

**DATES:** Registered bulk manufacturers of the affected basic classes, and applicants therefore, may file written comments on or objections to the issuance of the proposed registration on or before October 15, 2018.

**ADDRESSES:** Written comments should be sent to: Drug Enforcement Administration, Attention: DEA **Federal Register** Representative/DRW, 8701 Morrissette Drive, Springfield, Virginia 22152.

**SUPPLEMENTARY INFORMATION:**

The Attorney General has delegated his authority under the Controlled Substances Act to the Administrator of the Drug Enforcement Administration (DEA), 28 CFR 0.100(b). Authority to exercise all necessary functions with respect to the promulgation and implementation of 21 CFR part 1301, incident to the registration of manufacturers, distributors, dispensers, importers, and exporters of controlled substances (other than final orders in connection with suspension, denial, or revocation of registration) has been delegated to the Assistant Administrator of the DEA Diversion Control Division ("Assistant Administrator") pursuant to section 7 of 28 CFR part 0, appendix to subpart R.

In accordance with 21 CFR 1301.33(a), this is notice that on June 28th, 2018, Rhodes Technologies, 498 Washington Street, Coventry, Rhode Island 02816 applied to be registered as a bulk manufacturer of the following basic classes of controlled substances:

| Controlled substance | Drug code | Schedule |
| --- | --- | --- |
| Marihuana | 7360 | I |
| Tetrahydrocannabinols | 7370 | I |
| Dihydromorphine | 9145 | I |
| Methylphenidate | 1724 | II |
| Codeine | 9050 | II |
| Dihydrocodeine | 9120 | II |
| Oxycodone | 9143 | II |
| Hydromorphone | 9150 | II |
| Hydrocodone | 9193 | II |
| Levorphanol | 9220 | II |
| Morphine | 9300 | II |
| Oripavine | 9330 | II |
| Thebaine | 9333 | II |
| Oxymorphone | 9652 | II |
| Noroxymorphone | 9668 | II |
| Tapentadol | 9780 | II |

---

[3] *See United States* v. *Enova Corp.,* 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States* v. *Mid-Am. Dairymen, Inc.,* No. 73–CV–681–W–1, 1977–1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93–298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

*United States v. The Walt Disney Company et al.*, 18 Civ. 5800 (CM)

# Exhibit B



**The New York Times**

620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

August 20,   2018

I, Shannon Schmidt, in my capacity as a Principal Clerk of the Publisher of **The New York Times**
a daily newspaper of general circulation printed and published in the City, County and State of New
York, hereby certify that the advertisement annexed hereto was published in the editions of

**The New York Times** on the following date or dates, to wit on

8/13 - A11, 8/14 - A9, 8/15 - A5, 8/16 - A15, 8/17 - A8, 8/18 - A7, 8/19 - A14

Sworn before me the

20 day of Aug, 2018

Notary Public

DEIRDRE C. DEIGNAN
Notary Public, State of New York
Registration #01DE6271693
Qualified In Nassau County
Commission Expires Nov. 5, 2020

## Notice
### Department of Justice
### Antitrust Division

Take notice that the United States has filed a proposed Final Judgment in a civil antitrust case in the United States District Court for the Southern District of New York, United States of America v. The Walt Disney Company, Civil Action No. 1:18-cv-05800. On June 27, 2018, the United States filed a Complaint alleging that The Walt Disney Company's ("Disney") acquisition of certain assets from Twenty-First Century Fox, Inc. ("Fox") would violate Section 7 of the Clayton Act, 15 U.S.C. §18. The Complaint alleges that the acquisition would likely substantially lessen competition for the licensing of cable sports programming to multichannel video programming distributors in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, in each of the following designated market areas: Phoenix, Arizona; Detroit, Michigan; Milwaukee, Wisconsin; Cleveland, Ohio; Cincinnati, Ohio; Columbus, Ohio; Miami, Florida; Oklahoma City, Oklahoma; Tampa Bay, Florida; Dallas, Texas; St. Louis, Missouri; Atlanta, Georgia; Indianapolis, Indiana; Orlando, Florida; San Antonio, Texas; Minneapolis, Minnesota; Nashville, Tennessee; Memphis, Tennessee; San Diego, California; Raleigh-Durham, North Carolina; New Orleans, Louisiana; Kansas City, Kansas; Charlotte, North Carolina; Los Angeles, California; and New York, New York. The proposed Final Judgment, filed at the same time as the Complaint, requires Disney to divest all of Fox's interests in the following regional sports networks: (i) Fox Sports Arizona; (ii) Fox Sports Carolinas; (iii) Fox Sports Detroit; (iv) Fox Sports Florida; (v) Fox Sports Indiana; (vi) Fox Sports Kansas

City; (vii) Fox Sports Midwest; (viii) Fox Sports New Orleans; (ix) Fox Sports North; (x) Fox Sports Ohio; (xi) Sportstime Ohio; (xii) Fox Sports Oklahoma; (xiii) Fox Sports San Diego; (xiv) Fox Sports South; (xv) Fox Sports Southeast; (xvi) Fox Sports Southwest; (xvii) Fox Sports Sun; (xviii) Fox Sports Tennessee; (xix) Fox Sports West; (xx) Prime Ticket; (xxi) Fox Sports Wisconsin; and (xxii) the YES Network.

A Competitive Impact Statement filed by the United States describes the Complaint, the proposed Final Judgment, and the remedies available to private litigants who may have been injured by the alleged violations.

Copies of the Complaint, proposed Final Judgment, and Competitive Impact Statement are available for inspection on the Antitrust Division's website at http://www.justice. gov/atr and at the Office of the Clerk of the United States District Court for the Southern District of New York. Interested persons may address comments to Owen M. Kendler, Chief, Media, Entertainment, and Professional Services Section, Antitrust Division, Department of Justice, 450 Fifth Street NW, Suite 4000, Washington, DC 20530 (telephone: 202-305-8376) within 60 days of the date of this notice. Such comments, including the name of the submitter, and responses thereto, will be posted on the Antitrust Division's website, filed with the Court, and, under certain circumstances, published in the Federal Register.

*United States v. The Walt Disney Company et al.*, 18 Civ. 5800 (CM)

# Exhibit C

Ad # 12200390     Name CARAT ENTERPRISE AGENCY ATTN: ACCOUNTS P     Size 5 X 147 COLIN T0014
Class 815    PO# N-18DIZ0032-REV Authorized by Sam Langer                          Account 2010249388

PROOF OF PUBLICATION

District of Columbia, ss., Personally appeared before me, a Notary Public in and for the
said District, Travona James well known to me to be BILLING SUPERVISOR
of The Washington Post, a daily newspaper published in the City of Washington,
District of Columbia, and making oath in due form of law that an advertisement containing
the language annexed hereto was published in said newspaper on the dates mentioned in the
certificate herein.

I Hereby Certify that the attached advertisement was published in
The Washington Post, a daily newspaper, upon the following date(s) at a cost of ████████
and was circulated in the Washington metropolitan area.

Published 7 time(s). Date(s):13,14,15,16,17,18 and 19 of August 2018

Account 2010249388

Witness my hand and official seal this _____ day of _____ 20 ___

My commission expires _____

--------------------------------------------------------------------------------------
Display Ad

# Notice

## Department of Justice
## Antitrust Division

Take notice that the United States has filed a proposed Final Judgment in a civil antitrust case in the United States District Court for the Southern District of New York, United States of America v. The Walt Disney Company, Civil Action No. 1:18-cv-05800. On June 27, 2018, the United States filed a Complaint alleging that The Walt Disney Company's ("Disney") acquisition of certain assets from Twenty-First Century Fox, Inc. ("Fox") would violate Section 7 of the Clayton Act, 15 U.S.C. §18. The Complaint alleges that the acquisition would likely substantially lessen competition for the licensing of cable sports programming to multichannel video programming distributors in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, in each of the following designated market areas: Phoenix, Arizona; Detroit, Michigan; Milwaukee, Wisconsin; Cleveland, Ohio; Cincinnati, Ohio; Columbus, Ohio; Miami, Florida; Oklahoma City, Oklahoma; Tampa Bay, Florida; Dallas, Texas; St. Louis, Missouri; Atlanta, Georgia; Indianapolis, Indiana; Orlando, Florida; San Antonio, Texas; Minneapolis, Minnesota; Nashville, Tennessee; Memphis, Tennessee; San Diego, California; Raleigh-Durham, North Carolina; New Orleans, Louisiana; Kansas City, Kansas; Charlotte, North Carolina; Los Angeles, California; and New York, New York. The proposed Final Judgment, filed at the same time as the Complaint, requires Disney to divest all of Fox's interests in the following regional sports networks: (i) Fox Sports Arizona; (ii) Fox Sports Carolinas; (iii) Fox Sports Detroit; (iv) Fox Sports Florida; (v) Fox Sports Indiana; (vi) Fox Sports Kansas City; (vii) Fox Sports Midwest; (viii) Fox Sports New Orleans; (ix) Fox Sports North; (x) Fox Sports Ohio; (xi) SportsTime Ohio; (xii) Fox Sports Oklahoma; (xiii) Fox Sports San Diego; (xiv) Fox Sports South; (xv) Fox Sports Southeast; (xvi) Fox Sports Southwest; (xvii) Fox Sports Sun; (xviii) Fox Sports Tennessee; (xix) Fox Sports West; (xx) Prime Ticket; (xxi) Fox Sports Wisconsin; and (xxii) the YES Network.

A Competitive Impact Statement filed by the United States describes the Complaint, the proposed Final Judgment, and the remedies available to private litigants who may have been injured by the alleged violations.

Copies of the Complaint, proposed Final Judgment, and Competitive Impact Statement are available for inspection on the Antitrust Division's website at http://www.justice. gov/atr and at the Office of the Clerk of the United States District Court for the Southern District of New York. Interested persons may address comments to Owen M. Kendler, Chief, Media, Entertainment, and Professional Services Section, Antitrust Division, Department of Justice, 450 Fifth Street NW, Suite 4000, Washington, DC 20530 (telephone: 202-305-8376) within 60 days of the date of this notice. Such comments, including the name of the submitter, and responses thereto, will be posted on the Antitrust Division's website, filed with the Court, and, under certain circumstances, published in the Federal Register.