# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

THE WALT DISNEY COMPANY, and
TWENTY-FIRST CENTURY FOX, INC.,

*Defendants*.

18 Civ. 5800 (CM) (KNF)

## RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENT
## ON THE PROPOSED FINAL JUDGMENT

Pursuant to the requirements of the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(b)–(h), the United States hereby responds to the one public comment received regarding the proposed Final Judgment in this case. After careful consideration of the submitted comment, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint. The United States will move the Court for entry of the proposed Final Judgment after the public comment and this response have been published pursuant to 15 U.S.C § 16(d).

## I.     PROCEDURAL HISTORY

On December 13, 2017, The Walt Disney Company ("Disney") entered into an agreement to acquire certain assets and businesses from Twenty-First Century Fox, Inc. ("Fox") (collectively, "Defendants"), including Fox's ownership of, or interests in, its regional sports

networks ("RSNs"), FX cable networks, National Geographic cable networks, television studio, Hulu, film studio, and international television businesses (collectively, the "Fox Sale Assets"). On June 20, 2018, the Defendants amended the agreement to increase Disney's consideration for the Fox Sale Assets to approximately $71.3 billion. On July 27, 2018, Disney's and Fox's respective shareholders voted to approve the transaction.

On June 27, 2018, the United States filed a civil antitrust Complaint, seeking to enjoin Disney from acquiring the Fox Sale Assets. The Complaint alleges that the proposed acquisition by Disney of certain cable sports programming assets from Fox, including Fox's ownership of, or interest in, twenty-two RSNs, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

Simultaneously with the filing of the Complaint, the United States filed a proposed Final Judgment and a Hold Separate Stipulation and Order signed by Plaintiff and Defendants consenting to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act, 15 U.S.C. § 16. Pursuant to those requirements, the United States filed a Competitive Impact Statement ("CIS") on August 7, 2018, describing the transaction and the proposed Final Judgment. The United States published the Complaint, proposed Final Judgment, and CIS in the *Federal Register* on August 15, 2018, *see* 83 Fed. Reg. 40,553 (2018), and caused summaries of the proposed Final Judgment and CIS, together with directions for the submission of written comments related to the proposed Final Judgment, to be published in *The Washington Post* and *The New York Times* for seven days, from August 13, 2018 through August 19, 2018. The 60-day public comment period required by the Tunney Act, 15 U.S.C. § 16(b) and (d), ended on October 18, 2018. The United States received one comment concerning the allegations in the Complaint (Exhibit 1).[1]

---

[1] In addition to the one comment, the United States also received an email from an

## II.      THE COMPLAINT AND THE PROPOSED FINAL JUDGMENT

The Complaint alleged that Disney's acquisition of the Fox RSNs would lessen competition in the licensing of cable sports programming to distributors in local markets where Disney and Fox compete. The proposed Final Judgment remedies this concern by requiring Disney to divest the twenty-two Fox RSNs it would have acquired as part of the Fox Sale Assets.

Disney's acquisition of the Fox Sale Assets would have combined two of the most valuable cable sports television networks: Fox's twenty-two RSNs and Disney's ESPN franchise of networks. Cable sports television networks compete to be carried in the programming packages that distributors, such as cable companies (e.g., Charter Communications and Comcast), direct broadcast satellite services (e.g., DISH Network and AT&T's DirecTV), fiber optic networks services (e.g., Verizon's Fios and CenturyLink's Prism TV), and online distributors of linear cable programming (e.g., Hulu Live and DISH's Sling TV), offer to their subscribers. For RSNs, the carriage license typically is limited to the Designated Market Area ("DMA") comprising the "home" territory of the team or teams carried on the RSN; whereas, licenses for national television networks, such as ESPN, typically comprise all DMAs in a distributor's footprint. Disney's and Fox's cable sports television programming compete head-to-head to be carried by distributors in each DMA that is the home territory of Fox's RSNs: Phoenix, AZ; Los Angeles, CA; San Diego, CA; Miami, FL; Orlando, FL; Tampa, FL; Atlanta,

---

individual based in Bangalore, India on the proxy voting procedure by which Disney and Fox shareholders approved the transaction. *See* Exhibit 2. This email is unrelated to the competitive concerns identified by the United States in the Complaint, and it is unrelated to the issue before this Court: whether the proposed Final Judgment is in the public interest. It is well-settled that comments that are unrelated to the concerns identified in the Complaint are beyond the scope of the court's Tunney Act review. *See, e.g.*, *United States v. Apple*, Inc., 889 F. Supp. 2d 623, 642 (S.D.N.Y. 2012); *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 14 (D.D.C. 2007) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995)); *see also United States v. U.S. Airways Group, Inc.*, 38 F. Supp. 3d 69, 76 (D.D.C. 2014) (quoting *Microsoft*, 56 F.3d at 1459).

GA; Indianapolis, IN; Kansas City, KS; New Orleans, LA; Detroit, MI; Minneapolis, MN; St.

Louis, MO; New York, NY; Charlotte, NC; Raleigh-Durham, NC; Cincinnati, OH; Cleveland,

OH; Columbus, OH; Oklahoma City, OK; Nashville, TN; Memphis, TN; Dallas, TX; San

Antonio, TX; and Milwaukee, WI (collectively, the "DMA Markets").

After Disney announced its plans to acquire the Fox Sale Assets, the United States

conducted an investigation into the competitive effects of the proposed transaction. The United

States considered the potential competitive effects of the transaction on cable sports

programming in DMAs throughout the United States. As a part of its investigation, the United

States obtained documents and information from the merging parties and others and conducted

interviews with customers, competitors, and other individuals knowledgeable about the industry.

Based on the evidence gathered during its investigation, the United States concluded that

Disney's acquisition of Fox's RSNs would likely (1) substantially lessen competition in the

licensing of cable sports programming in each of the DMA Markets; (2) eliminate actual and

potential competition among Disney and Fox in the licensing of cable sports programming in

each of the DMA Markets; and (3) cause prices for cable sports programming in each of the

DMA Markets to increase.

At the same time the Complaint was filed, the United States filed a Hold Separate

Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to

eliminate the likely anticompetitive effects of the Transaction. Under the proposed Final

Judgment, Disney is required to divest all of Fox's interests in the Fox RSNs, including all assets

necessary for the operation of each Fox RSN as a viable, ongoing cable sports programming

network, to one or more buyers acceptable to the United States in its sole discretion. Under the

terms of the Hold Separate, Disney and Fox have taken certain steps to ensure that each Fox

RSN continues to operate as an ongoing, economically viable, competitive cable sports programming network that will remain independent and uninfluenced by the consummation of the Transaction, and that competition is maintained during the pendency of the ordered divestiture.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. Nothing in the APPA or the parties' filings in this case prohibit Defendants from closing and consummating the Transaction during the pendency of the Tunney Act proceedings or prior to the Court's entry of the proposed Final Judgment. *See* 15 U.S.C. § 16(b)–(h).

### III.    STANDARD OF JUDICIAL REVIEW

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including

consideration of the public benefit, if any, to be derived from a
determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 637–38

(S.D.N.Y. 2011); *see SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158, 168 (2d Cir. 2012)

("We are bound in such matters to give deference to an executive agency's assessment of the

public interest."). *See generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C.

2007) (assessing public-interest standard under the Tunney Act); *United States v. U.S. Airways

Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited"

in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist.

LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent

judgment is limited and only inquires "into whether the government's determination that the

proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and

whether the mechanisms to enforce the final judgment are clear and manageable").

As this Court has held, under the APPA a court considers, among other things, "the

relationship between the complaint and the remedy secured, the decree's clarity, whether there

are any foreseeable difficulties in implementation, and whether the decree might positively injure

third parties." *United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012) (citing

*Microsoft*, 56 F.3d at 1458, 1461–62). With respect to the adequacy of the relief secured by the

decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the

public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v.*

*Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62; *Apple*,

889 F. Supp. 2d at 631. Instead:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

> *Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]

In determining whether a proposed settlement is in the public interest, a district court "is

not permitted to reject the proposed remedies merely because the court believes other remedies

are preferable." *United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012)

(quoting *United States v. Abitibi–Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008)); *SBC

Commc'ns*, 489 F. Supp. 2d at 17 ("[a district court] must accord deference to the government's

predictions about the efficacy of its remedies, and may not require that the remedies perfectly

match the alleged violations"); *see also U.S. Airways*, 38 F. Supp. 3d at 74–75 (noting that a

court should not reject the proposed remedies because it believes others are preferable and that

room must be made for the government to grant concessions in the negotiation process for

settlements); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the

government's predictions as to the effect of the proposed remedies"); *United States v. Archer-

Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant

---

[2] *See also BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

"due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case"). The ultimate question is whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461. To meet this standard, the United States need only provide "a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *Morgan Stanley*, 881 F. Supp. 2d at 567 (quoting *Abitibi–Consol.*, 584 F. Supp. at 165); *see also SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, under *Microsoft*, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633 637-38 (S.D.N.Y. 2011) ("The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will best serve society, but only to ensure that the resulting settlement is 'within the reaches of the public interest.'" (quoting *United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 238 (S.D.N.Y. 1997))); *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60; *see also United States v. Fokker Servs.*, 818 F.3d

733, 738 (D.C. Cir. 2016) (recognizing the "long-settled understandings about the independence

of the Executive with regard to charging decisions"); *Heckler v. Chaney*, 470 U.S. 821, 832

(1985) (quoting U.S. Const. art. II, § 3) (recognizing that the decision about which claims to

bring "has long been regarded as the special province of the Executive Branch.").

Finally, in the 2004 amendments to the APPA, Congress addressed the Tunney Act review

process, adding the unambiguous instruction that "[n]othing in this section shall be construed to

require the court to conduct an evidentiary hearing or to require the court to permit anyone to

intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a

court is not required to hold an evidentiary hearing or to permit intervenors as part of its review

under the Tunney Act). This language explicitly wrote into the statute what Congress intended

when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is

nowhere compelled to go to trial or to engage in extended proceedings which might have the

effect of vitiating the benefits of prompt and less costly settlement through the consent decree

process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for

the public-interest determination is left to the discretion of the court, with the recognition that the

court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act

proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11; *see also Apple*, 889 F. Supp. 2d at 632. A

court can make its public-interest determination based on the competitive impact statement and

response to public comments alone. *U.S. Airways*, 38 F. Supp. 3d at 76; *see also United States v.

Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly

allows the court to make its public interest determination on the basis of the competitive impact

statement and response to comments alone"); S. Rep. No. 93-298 93d Cong., 1st Sess., at 6

(1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

### IV.    PUBLIC COMMENT AND THE UNITED STATES' RESPONSE

During the 60-day comment period, the United States received only one comment from the American Cable Association ("ACA"), an organization that represents more than 700 small and medium-sized cable operators (Exhibit 1). Upon review, the United States believes that nothing in the comment warrants a change to the proposed Final Judgment or supports an inference that the proposed Final Judgment is not in the public interest. As required by the APPA, the comment and the United States' response will be published in the Federal Register.

In its comment, the ACA commends the proposed Final Judgment, noting that it "solves one significant antitrust problem . . . by requiring Disney to divest the Fox RSNs." Exhibit 1 at 1. However, it warns that a divestiture to a same-market, big-four broadcaster or a same-market distributor "threatens to create a *new* and equally significant antitrust problem." *Id.* While noting that the proposed Final Judgment gives the United States sole discretion to determine that the divestiture will preserve competition in the relevant markets, *id.* at 2; *see* Proposed Final Judgment, *United States v. The Walt Disney Co.*, 1:18-cv-5800 at IV.J (S.D.N.Y. June 27, 2018), the ACA requests the Final Judgment to be modified to expressly prohibit divestitures to a same-market broadcaster or same-market distributor. Exhibit 1 at 2.

The United States considers the existing terms of the proposed Final Judgment—which require the sale of the Fox RSNs "to one or more Acquirers acceptable to the United States, in its sole discretion," Proposed Final Judgment, *Disney*, 1:18-cv-5800 at IV.A—sufficient to ensure that competition will be preserved in all affected markets. In exercising its sole discretion to approve buyers, the United States has a duty to ensure that the remedy addresses the harm arising

from the merger and preserves competition. The Antitrust Division employs three fundamental tests when reviewing proposed divestiture buyers: 1) divestiture of the assets to the proposed purchaser must not itself cause competitive harm, 2) the Division must be certain that the purchaser has the incentive to use the divestiture assets to compete in the relevant market, and 3) the Division will perform a "fitness" test to ensure that the purchaser has sufficient acumen, experience, and financial capability to compete effectively in the market over the long term. As required by the first fundamental test, the Antitrust Division will review whether divesting the Fox RSNs to Disney's proposed buyer(s) would itself cause competitive harm. Moreover, the second and third fundamental tests go further—requiring the Antitrust Division to assess both the incentive and ability of the buyer to actively compete with the Fox RSNs.

The Court should reject the ACA's invitation to substitute its judgment for the United States' judgment of the acceptability of divestiture buyers and the overall effect of the divestitures on competition. Approving divestiture buyers is the type of action that is properly within the United States' discretion. S*ee InBev N.V./S.A.*, 2009 U.S. Dist. LEXIS 84787 at *23 (questioning the court's role in monitoring the reasonableness of the United States' approval of a divestiture buyer); *Morgan Stanley*, 881 F. Supp. 2d at 568; *Microsoft*, 56 F.3d at 1461; *Citigroup Global Markets, Inc.*, 673 F.3d at 163–64. ACA cites no legal basis for its proposed restriction of the United States' discretion. Nor does the ACA claim that the factual foundation underpinning the proposed Final Judgment renders the proposed settlement unreasonable. *See* Exhibit 1. In Tunney Act proceedings, courts routinely enter final judgments that provide the United States with the sole discretion to assess the acceptability of divestiture buyers. *See, e.g.*, Final Judgment, *United States v. Marquee Holdings, Inc.*, 5-cv-10722 (S.D.N.Y. Jan. 9, 2006); Final Judgment, *United States v. AMC Entertainment Holdings, Inc.*, 16-cv-2475-RDM (D.D.C.

Mar. 7, 2017);  Final Judgment, *United States v. United Technologies Corp.*, 1:12-cv-1230-KBJ

(D.D.C. May 29, 2013); Final Judgment, *United States v. Dean Foods Co.*, 10-cv-59 (E.D. Wis.

July 29, 2011); Final Judgment, *United States v. AT&T Inc.*, 1:09-cv-1932-HHK (D.D.C. Feb.

10, 2010); Final Judgment, *United States v. Sony Corp. of America*, 98-cv-2716 (S.D.N.Y. Nov.

16, 1998). There is no justification here to depart from the ordinary course and fetter the United

States' discretion.


## CONCLUSION

After reviewing the public comment, the United States continues to believe that the

proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the

antitrust violations alleged in the Complaint, and is therefore in the public interest. The United

States will move this Court to enter the proposed Final Judgment after the comment and this

response are published in the Federal Register.


Dated: April 5, 2019


Respectfully submitted,


*/s/ Lauren G.S. Riker*
Lauren G.S. Riker
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Tel: 202-598-2812
Lauren.Riker@usdoj.gov

Counsel for the United States

12

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2019, a true and correct copy of the foregoing was served upon the parties of record via the Court's ECF system.


Dated: April 5, 2019

*/s/ Lauren G.S. Riker*
Lauren G.S. Riker
U.S. Department of Justice
Antitrust Division
Media, Entertainment, and Professional
Services Section
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Phone: (202) 598-2812
Facsimile: (202) 514-7308
E-mail: lauren.riker@usdoj.gov

*Counsel for the United States*

*United States v. The Walt Disney Company et al.*, 18 Civ. 5800 (CM)

# Exhibit 1



October 15, 2018

**BY ELECTRONIC MAIL**

Owen M. Kendler, Esq.
Chief, Media, Entertainment, and Professional Services Section
Antitrust Division
Department of Justice
Washington, DC  20530
*atr.mep.information@usdoj.gov*

Re:    **ACA Tunney Act Comments on *United States v. Walt Disney***
       **Proposed Final Judgment**

Dear Mr. Kendler:

The American Cable Association, which represents more than 700 small and medium-sized cable operators, hereby submits its Tunney Act comments regarding the proposed Final Judgment filed in *United States v. Walt Disney*.[1]  The proposed Final Judgment solves one significant antitrust problem—the combination of Disney's ESPN with Fox's regional sports networks ("RSNs")—by requiring Disney to divest the Fox RSNs.  Such divestiture, however, threatens to create a *new* and equally significant antitrust problem.[2]

More specifically, it would be contrary to the public interest to permit the divestiture of the Fox RSNs either to a same-market, big-four broadcaster or to a same-market multichannel video programming distributor ("MVPD"):

- Permitting such a broadcaster to purchase a Fox RSN would create the very problem the Antitrust Division identified here.  It would allow a single firm to threaten to withhold two sets of must-have programming, thereby leading to increased MVPD licensing fees.

- Permitting such an MVPD to purchase an RSN would create the "vertical integration" problem the Division identified in blocking the AT&T-Time Warner merger.  The

---

[1]    Antitrust Procedures and Penalties Act 15 U.S.C. § 16(b)-(h); *United States v. Walt Disney Co.*, Proposed Final Judgment and Competitive Impact Statement, 83 Fed. Reg. 40553 (rel. Aug. 15, 2018) ("*Proposed Final Judgment*").

[2]    *See* Antitrust Division Policy Guide to Merger Remedies at 28 (describing as a "fundamental test[]" of divestiture approval that the "divestiture of the assets to the proposed purchaser [does] not itself cause competitive harm.").

combined entity would have greater leverage to threaten to withhold RSN programming from rival MVPDs than would a stand-alone RSN owner, thereby leading to increased MVPD licensing fees.

The proposed Final Judgment already provides the Division with the "sole discretion"[3] to approve a divestiture party for Fox's RSNs. But the Final Judgment should make clear beforehand that the Division will not permit any divestiture to a same-market broadcaster or same-market MVPD. A settlement permitting any such divestiture would not be in the public interest.

## I.     The Division Should Not Permit Disney to Divest Fox's RSNs to a Same-Market Broadcaster.

The Competitive Impact Statement described the problem that an ACA member would face in negotiating with a newly combined ESPN-Fox RSN—losing both sets of programming simultaneously is far worse than losing each set of programming individually:

> Prior to the Transaction, an MVPD's failure to reach a licensing agreement with Disney would result in the blackout of Disney's networks, including ESPN, and threaten some subscriber loss for the MVPD, including those subscribers that value ESPN's content. But because the MVPD still would be able to offer its subscribers the local Fox RSN, many MVPD subscribers simply would watch the local RSN instead of cancelling their MVPD subscriptions. In the event of a Fox RSN blackout, many subscribers likely would switch to watching ESPN. After the Transaction, an MVPD negotiating with Disney would be faced with the prospect of a dual blackout of significant cable sports programming, a result more likely to cause the MVPD to lose incremental subscribers (that it would not have lost in a pre-transaction blackout of only ESPN or the Fox RSN) and therefore accede to Disney's demand for higher licensing fees. For these reasons, the loss of competition between ESPN and the Fox RSN in each DMA Market would likely lead to an increase in MVPD licensing fees in those markets. Some of these increased programming costs likely would be passed onto consumers, resulting in higher MVPD subscription fees for millions of U.S. households.[4]

An ACA member would face this exact problem in negotiating simultaneously with a Fox RSN and a same-market, big-four broadcaster,[5] which invariably controls sports rights at

---

[3]   *Proposed Final Judgment*, 83 Fed. Reg. at 40557 § IV.A (requiring Fox to divest its RSNs "in a manner consistent with this Final Judgment to one or more Acquirers acceptable to the United States, in its sole discretion").

[4]   *Id.*, 83 Fed. Reg. at 40564 § B.2.

[5]   By "same-market broadcaster," we refer to a television station located in a designated market area served by the RSN at issue. Thus, for example, WTTG-5 is in the Washington DC

Owen M. Kendler, Esq.
October 15, 2018
Page 3 of 6

least as important as those controlled by ESPN. Absent the combination, failure to reach an agreement with the RSN would result in some subscriber loss—but other subscribers would watch the broadcaster's programming instead. With the combination, the ACA member would be faced with the prospect of a dual blackout, making it more likely that it would lose incremental subscribers.[6] It would thus be more likely to accede to demands for higher fees. This may be because the broadcaster's sports programming constitutes a partial substitute for the RSN's programming—a conclusion not inconsistent with the Division's original conclusion that broadcast programming is not a *sufficiently strong* substitute to prevent harms from the Fox RSN-ESPN combination.[7] Or it may be true regardless of substitutability.[8] Regardless of the theory, the best empirical analysis, conducted by the FCC's economists, suggests that RSN-broadcast combinations lead to higher prices.[9] The Final Judgment should reflect that fact here.

---

DMA, which is also served by Comcast's NBC SportsNet Washington, an RSN. So WTTG would be a "same-market broadcaster" with respect to NBC SportsNet Washington. (Please note that RSNs often cover multiple markets. NBC SportsNet Washington, for example, covers both Washington and Baltimore. So WBFF-45 in Baltimore would be a "same market broadcaster" with respect to NBC SportsNet Washington as well.) By "big four" broadcaster, we refer to stations affiliated with the ABC, NBC, CBS, and FOX networks, each of which offers "must have" sports programming.

[6] We note that Sinclair appears to have expressed interest in obtaining Fox's RSNs. Gerry Smith, *Sinclair Considers Tapping Private Equity to Buy Fox Sports Networks*, Bloomberg (Oct. 2, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-02/sinclair-mulls-tapping-private-equity-to-buy-fox-sports-networks. By our calculations, Sinclair's broadcast stations overlap Fox's RSNs to a greater extent than do Fox's own broadcast stations.

[7] *Proposed Final Judgment*, 83 Fed. Reg. at 40563 § II.B.

[8] For example, it may be that increased size permits a broadcaster to claim a larger share of the joint gains from agreement—what economists call "bargaining power" or "bargaining skill." Or it may be that MVPDs are risk averse, and their marginal disutility from lost income increases in the amount of income lost. Or, in certain circumstances, combining negotiations for two sets of "must-have" programming could make the demand for each type of programming less sensitive to price. *See, e.g.*, Comments of the American Cable Association at 26 *et seq.* and Attachment 1, FCC Docket No. 15-216 (filed Dec. 1, 2015) (containing submission by Michael H. Riordan, Professor of Economics at Columbia University).

[9] *See Comcast Corporation, General Electric Company and NBC Universal, Inc.*, 26 FCC Rcd. 4238, ¶ 137 (2011) (finding that "an analysis of the relevant data, presented in the Technical Appendix, suggests that joint ownership of an RSN and broadcast station in the same region may lead to substantially higher prices for the jointly owned programming relative to what would be observed if the networks were under separate ownership").

Owen M. Kendler, Esq.
October 15, 2018
Page 4 of 6

## II.    The Division Should Not Permit Disney to Divest Fox's RSNs to a Same-Market MVPD.

While divestiture of Fox's RSNs to a broadcaster would replicate the problem that the Division identified in *this* proceeding, divestiture to a same-market MVPD[10] would replicate the problem the Division identified in seeking to block the AT&T-Time Warner merger—a *vertical* combination of Fox's RSN programming and MVPD distribution will lead to price increases.[11] Here is how the government explained its concerns about vertical integration:

> Pre-merger, a blackout of Turner programming on Charter (for example) cost Time Warner license fees from Charter and advertising revenue from reduced viewership, and it cost Charter current and potential customers because its service is less attractive without the desirable Turner programming.  Crucially, post-merger, that same blackout is less costly to AT&T than it had been to Time Warner alone because some Charter subscribers will switch to AT&T's DirecTV or UVerse. . . .  It is precisely because of this diversion to DirecTV (which would have the competitively valuable Turner content) that the costs of blackouts to the merged entity would be lower than absent the merger.  Because—solely as a result of the merger—the costs of not reaching a deal are reduced, Time Warner will have increased leverage to negotiate better terms with rival distributors. Exercising that leverage will result in increased programming fees for those rival distributors—lessening competition among DirecTV and its rivals—and ultimately increasing prices for millions of American consumers.[12]

So too if Fox RSNs are divested to a same-market MVPD.[13]  Today, if Fox fails to reach agreement with an ACA member, it loses license fees and advertising revenue.  If combined with an MVPD that competes with the ACA member, however, the calculus changes.  The *RSN* loses license fees from the ACA member and advertising revenue.  But the *competing MVPD* gains

---

[10]   By "same-market MVPD," we mean an MVPD offering service within the RSN's service area.  Please note that AT&T and DISH both provide service nationwide, and would thus be "same-market MVPDs" with respect to all Fox RSNs.

[11]   The Division has identified this concern previously.  *See United States v. Comcast Corp.*, No. 11-cv-00106 (D.D.C. 2011), § II.D.2.A.  So too has the Federal Communications Commission.  *See, e.g.*, *Adelphia Commc'n Corp., and Time Warner Cable*, 21 FCC Rcd. 8203, ¶¶ 122-65 (2006) ("*Adelphia Order*").

[12]   Proof Brief of Appellant at 33-34, *United States v. AT&T Inc.*, No. 17- 2511 (D.C. Cir. 2018).

[13]   *See* Mike Farrell, "It's Game On for Fox RSN Sell-Off," Multichannel News (Aug. 28, 2018) (listing as potential suitors John Malone; Liberty Media; Madison Square Garden's ruling Dolan family or Dolan-controlled entities such as MSG Networks; AT&T; Verizon; and Comcast), *available at* https://www.multichannel.com/news/its-game-on-for-fox-rsn-sell-off.

Owen M. Kendler, Esq.
October 15, 2018
Page 5 of 6

new fees from subscribers who switch to it from the ACA member in order to retain their RSN programming.  There is, in other words, a "silver lining" for the combined RSN/MVPD if it fails to reach a deal.  This gives the combined entity additional leverage—which means that prices will increase.[14]

Of course, as the *AT&T-Time Warner* litigation has made clear, a key factor in determining the magnitude of concern about vertical integration is the so-called "diversion rate"—that is, how many subscribers will switch providers in order to retain particular programming.  This, in turn, depends on the importance of the programming itself.  In this regard, we would note that the *AT&T-Time Warner* merger did not involve RSNs at all.  And the Federal Communications Commission has considered RSNs paradigmatic "must have" programming—the kind of programming for which subscribers will switch providers—for at least fifteen years.[15]  Vertical integration involving RSNs, in other words, should concern the Division at least as much as does any other type of vertical integration.

*     *     *

Again, we very much appreciate the Division's efforts to address concerns related to the combination of Fox's RSN assets and Disney's ESPN.[16]  But it would not be in the public interest to permit the divestiture of Fox's RSNs to a same-market, big-four broadcaster or to a same-market MVPD.  Moreover, since the antitrust problems raised by these kind of divestitures are evident before the fact, the Division need not expend the resources to examine such divestitures individually or after the fact.

---

[14]  *See* Amicus Brief of William Rogerson and the American Cable Association at 11-12, *United States v. AT&T Inc.*, No. 17-2511 (D.C. Cir. 2018).

[15]  *Gen. Motors Corp. & Hughes Elecs. Corp.*, 19 FCC Rcd. 473, ¶ 147 (2004); *News Corp., DIRECTV Group, Inc., and Liberty Media Corp.*, 23 FCC Rcd 3265, ¶ 87 (2008); *Adelphia Order* ¶ 128.

[16]  Press Release:  "ACA Applauds DOJ For Requiring Disney To Divest 22 Fox Regional Sports Networks" (June 27, 2018), *available at* http://www.americancable.org/aca-applauds-doj-for-requiring-disney-to-divest-22-fox-regional-sports-networks/.

Owen M. Kendler, Esq.
October 15, 2018
Page 6 of 6

Respectfully submitted,

Michael Nilsson
Mark Davis
*Counsel to the American Cable Association*

*United States v. The Walt Disney Company et al.*, 18 Civ. 5800 (CM)

# Exhibit 2

**From:** ATR-LitIII-Information
**To:** ATR-LT3-Section-Inbox
**Subject:** FW:
**Date:** Thursday, August 16, 2018 11:02:06 AM

**From:** Sukhbir Sadana
**Sent:** Thursday, August 16, 2018 11:01:24 AM (UTC-05:00) Eastern Time (US & Canada)
**To:** Delrahim, Makan (ATR); ATR-LitIII-Information;

**Subject:**

Sukhbir Sadana,
Bangalore,
India.
Cell: █████████

Mr.Makan Delrahim,
Head-anti-trust dept.
Dept. of Justice
Washington DC.

Dear Mr.Delrahim,
The anti-trust department  has  green-lighted the Fox-Films and Disney merger for **$ 71 billion** in just **6 months time** ( <u>**one year before**</u> the scheduled time in <u>**2019.)**</u>

In comparison,  AT & T and Time Warner merger was in **"consideration"** for <u>18 months</u> by the DOJ before the deal went through a few weeks back.

<u>This is highly unusual.</u>

There is also high probability that there was a **"bid-rigging"** method used for the merger by Disney to jack-up the price of the merger.

In this kind of fraud, two CEOs of competing companies and the CEO of the

target company join hands in pushing up the merger price of the company artificially by bidding higher than their rival.

<u>The spoils are later divided through seemingly **"legitimate"** transactions or **money-laundering** methods between the two / three CEOs and nobody is the wiser.</u>

Just see how this happened :

 Bob Iger bids **$ 52 billion** for Fox in December 2017 ( with a reverse break-up fee clause of $ 2.5 billion which Disney would have to pay to Fox if it broke the deal.)

Then Comcast "bids" **$ 65 billion** for Fox ( with no intention of buying because there is no reverse break-up fee clause.)

Then Bob Iger bids **$ 71 billion** in June 2018 and the Disney board **"agrees".**

There is an additional debt of **$ 14 billion** on Fox which takes the merger price to **$ 85 billion.**

Even if Disney doesn't pay a single cent as dividend to its share-holders for the next **10 years** it will be very difficult for Disney to break even.


The share-holders meeting on June 27, 2018 in the New york Hilton lasted only 9 minutes when the head-of-legal of Disney Mr.Alan Braverman said - **"99% of share-holders have voted by proxy and have approved the merger."**

This was a ridiculous lie because in <u>any kind of voting</u> there are at least 20% people who have differing views.

Mr.Braverman refused to divulge names of share-holders who have voted **"for"** this merger which is a dead give-away of this rigged share-holders meeting.

<u>Why was nobody from the anti-trust department there in this meeting to verify his claims ?!</u>

Disney has also refused to reveal the names of Banks who have lent **$ 14 billion** to Fox and so there is a strong possibility that this money too will be swindled.

We are all wondering why you didn't point out these discrepancies to the Federal judge who has to approve this merger.

Nowhere on the DOJ's website is the name of the judge/court where this case is being heard.

Please do discuss the case with this hon'ble Attorney General of the DOJ - Mr.Jeff Sessions.

There are still 10 days left in this court for objections by the public.

I would appreciate it if you could reply to my email and give me the name of the relevant judge and court where I could file my objection.

regards,
Sukhbir


CC: Mr.Jeff Sessions ( Attorney General-DOJ ), Mr.Rod Rosenstein (Deputy-AG)